## Samuel Worthington *vs.* Alexander C. Bullitt and others.

A parol agreement though partly performed at the time it was made, is still executory in its character, and the parties may reduce it to writing or substitute an entirely new written contract in its place, and when this is done the verbal agreement becomes merged in the written contract.

Where there is a parol agreement respecting the purchase of lands, and afterwards a bond of conveyance for the same land is executed with the assent of both parties, it merges and extinguishes all previous parol agreements.

Where there are two agreements of equal dignity, between the same parties and in relation to the same subject matter, the last in point of date must control the first if inconsistent with it.

Where a written contract merges a prior parol agreement, and it is not produced nor its absence explained, parol evidence of its contents or of the terms of the original parol agreement is not admissible.

A witness who on his examination in chief, stated that he had given a bond of conveyance to his son, was asked on cross-examination, "when he gave it and in whose possession it now is?" to which he replied, "he did not

know; the bond will speak for itself: that it was and he supposes now is in possession of his son's counsel." HELD :

That this cross-examination did not prevent the party making it, from excepting to parol proof of the date and the contents of the bond.

A deed founded upon a moneyed consideration, which bears no adequate relation to the real value of the property, though valid as between the parties, may be assailed in chancery by creditors, solely upon the ground of inadequacy of consideration.

A father being indebted and in embarrassed circumstances, conveyed to his son land worth upwards of $20.000, for the moneyed consideration expressed in the deed of $12,000, of which but $5000 was in fact paid in money by the son. HELD :

That this was a voluntary conveyance to the extent of the excess of the value of the land over the $5000, and was therefore void as to creditors who were such prior to and at its date.

Whether such a voluntary deed can be supported or not, depends upon the condition of the grantor at its date : if he had then creditors who would be ,by it hindered and delayed in collecting their debts, though he was not in ·fact insolvent, still, so far as it is a voluntary conveyance, or resting upon ,natural love and affection, it is void.

·CROSS-APPEALS from the Court of Chancery.

The bill in this case was filed on the equity side of Balti·more county court, on the 10th of September 1830, by Bullitt and others, creditors of Walter Worthington, to vacate .three deeds executed by said Walter to his son Samuel Wor-.thington.

By the *first* of these deeds dated the 28th of March 1825, ·the said Walter conveyed to his son Samuel, a tract of land ,called "*Gerar*," containing about 280 acres, for the moneyed consideration expressed upon its face of $12,000.   The *second* dated the 16th of June of the same year, was executed to cure a supposed defect in the acknowledgment of the first. The *third* dated the 8th of September 1826, was a mortgage of negro slaves and other personal property, to secure to the mortgagee Samuel, the payment of the sum of $4000, with interest from the 2nd of June 1825, which it was alleged his said son advanced to the mortgagor.   Walter took the benefit of the insolvent laws, on the 7th of January 1828.   These .deeds were all assailed by the .complainants and the insol-

vent's trustee, as fraudulent as against creditors, and therefore void under the statute of 13 Elizabeth, ch. 5; and the last was also assailed as a fraudulent preference under the insolvent laws.

The answers of said Walter and Samuel, state that the deed for the land was executed under circumstances and for considerations substantially as follows: The son had always lived with, and after he had attained an age to be useful, had worked for and served his father, and many years ago, the father who was then free from debt and in affluent circumstances, actuated by natural love and affection, and by satisfaction with his past services and conduct, promised and agreed with the son to buy and convey to him a farm, and settle him thereon: That in the year 1817, in pursuance of this promise and agreement, he purchased the land in question for his son, and in the fall of that year put him in possession thereof, but having given more for it than he supposed would be his (the son's) fair portion of his estate, he made an agreement and stipulation with the son, that the latter should pay him $5000 in money therefor, that being the just difference between the value of the land and the portion which he supposed himself able to give or to leave to each of his other children, and agreed to execute a deed for the land when that sum should be paid: That at the time of the purchase and delivery of possession, the farm was destitute of fencing and without the necessary buildings and improvements, all of which were subsequently made and erected by the son, who has ever since resided upon it and continued to cultivate and improve it: That the son from time to time, between 1818 and 1825, made payments on account of the said $5000, until the whole was paid in the latter year and the deed executed: That previous to the execution of this deed, the father gave to the son a written engagement to execute a conveyance of the land upon payment of said sum: That the son obtained the means to pay this money partly by a sale of a small portion of the land, partly by the sale of lime and stone therefrom, partly by the sale of grain and other ordi-

nary produce of the land, and partly by borrowed money and the sale of negroes. It was admitted, that no other sum than said $5000, was paid by the son for the land, and that the deed was executed upon the above stated considerations alone.

The answers then deny all fraud in the execution of either of the deeds assailed, and aver that the last, the mortgage of personal property, was executed *bona fide* and for the consideration stated upon its face. They deny that at the time of the purchase of this land and the agreement by the father, he was indebted to either of the complainants or to any other person, except for a part of the purchase money therefor, which he subsequently paid, but admit that about the middle of the year 1825, he became embarrassed and indebted, by assuming the debts and responsibilities of his youngest son, in order to save him as he hoped from utter and irretrievable ruin, and that he took the benefit of the insolvent laws as charged in the bill.

A large mass of proof both documentary and oral was taken, but it is only necessary to state that this proof shows, that Walter Worthington purchased the land at trustee's sale, on the 2nd of June 1817, for $21,967.71, and obtained a conveyance therefor, on the 19th of May 1821. That he had seven children besides Samuel, and that prior to and at the date of the deeds in 1825, he was indebted to some of the complainants, to a considerable amount, and had sold or encumbered by mortgages to its full value, the greater part of the residue of his property: That the land when taken possession of by Samuel, was not rich or productive, but he improved the soil very much, brought it to a high state of cultivation, erected a dwelling and barn thereon in 1829, at a cost of $4000, and other buildings, lived in an economical manner, and was a very industrious and saving man.

Walter Worthington was examined as a witness, and testified to substantially the same facts contained in his answer, in reference to the promise to his son, the purchase of the land for him, and putting him in possession thereof, the agreement

that the son should pay $5000 therefor, the payment thereof, and the execution of the deeds of March and June 1825. In reference to the written agreement, to convey the land stated in his answer, he said, in his examination in chief, "that sometime after he purchased the land, he gave his son a bond of conveyance conditioned to convey said farm to him, the date he does not recollect, but the bond will speak for itself," and in reply to a cross-interrogatory by the complainants, which after referring to his testimony in chief on this point, asks, "when did you give that bond? and do you know in whose possession it is now?" he replied, "he did not know the time: the bond will speak for itself: Judge Heath was Samuel Worthington's counsel, and the bond was and he supposes now is in his possession."

The complainants excepted to any evidence tending to add to, vary or contradict the deeds impeached, by proof of any consideration not expressed upon their face, or by setting up any consideration inconsistent with or repugnant to the consideration therein expressed: Also to the admissibility of any parol proof, to set up or establish any written agreement or obligation to convey, which, if it ever existed, is not produced, no sufficient reason being assigned for its non-production.

The Chancellor (JOHNSON,) passed a decree vacating the deeds of March and June 1825, as against the prior creditors of the grantor, and dismissing the bill so far as it related to the deed of September 1826. From this decree both parties appealed, the defendant, Worthington, from that part of it vacating the deeds of 1825, and the complainants, the creditors, from that part dismissing the bill as to the deed of 1826. The chancellor's opinion is reported in 3 *Md. Ch. Dec.*, 99.

The cause was argued before LE GRAND, C., J., ECCLESTON and MASON, J.

*James M. Buchanan* for the defendant Worthington.

This case is of long standing, the bill having been filed

nearly a quarter of a century ago. It is also an important one, not only for the reasons assigned by the chancellor, but on another ground; it involves the character of the dead as well as of the living.

The deeds of March and June 1825, and September 1826, are assailed by the bill as fraudulent at common law, under the statute of 13 *Elizabeth*, and under the insolvent laws of this State. I shall maintain that they are substantial and valid instruments in whatever aspect they may be considered. 1st. As to the deed of the real estate of March 1825: The point is that this conveyance was made in fraud of creditors, and without fair and valuable consideration. This point is to be treated independently of the insolvent laws, and before I examine the pleadings and proofs in reference to it, I will state a few familiar principles of law applicable to the facts and in answer to the point as to the consideration of the deed.

The consideration of a deed must be good or valuable. A good consideration is founded on natural love and affection between near relations by blood. A valuable consideration is founded on something deemed valuable, as money, goods, *services* and marriage. 4 *Kent*, 464. It is sufficient if the deed be for money received or for value received without mentioning the certainty of the sum; and if any sum is mentioned, the smallest in amount or value, it will be sufficient to raise the use. 2 *Johns.*, 230, *Jackson vs. Schoonmaker.* 3 *Do.*, 484, *Jackson vs. Alexander.* 2 *Hill*, 659, *Goodell vs. Pierce.* 1 *H. & J.*, 527, *Cheney vs. Watkins.* If the deed be brought in question the consideration may be averred in pleading and supported by proof. 4 *Kent*, 465. The grantor may prove that there were other considerations than the one expressed. It is an established rule that the party may aver another consideration which is *consistent* with that expressed, but no averment can be made which is *contrary* to or *inconsistent* with that expressed in the deed. 1 *Philip's Ev.*, 549. 1 *H. & G.*, 175, *Betts vs. Union Bank.* 10 *G. & J.*, 248, *Harris vs. Alcock.* 1 *Gill*, 423, *Cole vs. Albers & Runge.* Where the consideration of a deed of bargain and sale of

23     v.6

lands was stated to be a sum of money, but it was averred and found by the jury that the indenture was made *as well in consideration of marriage* as of the said sum of money, it was adjudged that though there was a *partial* consideration mentioned in the deed, an averment might be made of *another* consideration which *stood with* the indenture and which was not contrary to it. Held by *Lord Coke*, in 2 *Dyer*, 146. It is not *inconsistent* with the deed to prove another consideration in addition to the one expressed. 1 *Philip's Ev.*, 550. Although the recital of the deed be not conformable with the facts, yet that will not vitiate the deed if, under all the facts and circumstances, it shall appear that the deed was fair. When this is the case, however, it will subject the deed to a rigorous scrutiny. 2 *H. & G.*, 431, *Hudson vs. Warner & Vance.*

With these principles in view I shall proceed to examine the proceedings and proof for the purpose of ascertaining the nature and character of this deed, and I shall maintain, *first*, that this was not a *voluntary* deed, but that it was a deed of bargain and sale, upon a fair, full and valuable consideration.

The answer of each defendant is directly responsive to the bill and is to be taken as conclusive, unless contradicted by two witnesses, or by one with corroborating circumstances. 2 *Story's Eq.*, sec. 1523. The validity of the deed depends on *the intention* of the parties, and their answers setting forth their *motives and intentions* are conclusive upon the question, unless overcome by the testimony of two witnesses, or of one with pregnant circumstances. 9 *Gill*, 218, *Beatty vs. Davis.* 3 *Md. Rep.*, 229, *Glenn vs. Grover.* The answer of one defendant is not evidence *against* the other, but when responsive to the bill is evidence *against the plaintiff* in favor of the other defendant. 10 *G. & J.*, 404, *Jones vs. Hardesty.* 6 *Cranch*, 8, *Field vs. Holland.* The answer here of each defendant negatives the allegation that the deed was without fair and valuable consideration, and in fraud of creditors, and they are evidence each and both of them against the complainants.

The answer of Walter Worthington states that he became indebted about the middle of the year 1825, (the deed bears date early in the spring of that year,) by assuming the debts of his youngest son, and denies that he had any knowledge of the existence of these debts when he executed the deed. He then proceeds to state the circumstances under which it was executed, and if they are true and uncontradicted by proof, they are conclusive to show that the deed was executed for a fair, *bona fide* and valuable consideration, and by no means in fraud of creditors, who *could not* be defrauded because they did not exist.   He says that in 1817, in pursuance of a promise to and *agreement* with his son, who had lived with and labored for him down to that time, he purchased the land in question *for his son;* his words are not only a promise to, but an *agreement* with, his son to buy *for him* a farm; this was in 1817, when the son had become twenty-one years of age.   Now if the proof stopped here and was unexplained by any other proof, it might be contended that this was a mere *voluntary* agreement, which the father could repudiate whenever he thought proper.   But even then it might well be contended that that is not a voluntary agreement which is founded as well on *valuable services rendered* as on natural love and affection.   The *services* rendered form, as said by *Lord Coke*, as valuable a consideration in a deed of bargain and sale as a *money* consideration; it is one of the very *considerations* which is denominated a valuable consideration.   But it is said these services were rendered whilst the son *lived with* the father and during his *minority*.   It is true a father is entitled to the services of his minor child, but he may at any time *relinquish* his claim to them and agree to compensate the child for them, and such relinquishment may be proved by parol, and in such cases the services belong to the infant himself.   2 *Blackf.*, 449, *Jenison vs. Graves.*   11 *Verm.*, 477, *Tillotson vs. McCrillis.   Ibid.*, 273, *Thomas vs. Dike*.   But the answer does not stop here; it further says he *stipulated and agreed* with his son that the latter should pay him $5000 for said land, that being the difference between

.its value and what he then supposed himself able to give or to leave to each of his other children, and that very shortly thereafter he put his son in possession of the land, who put up buildings and fences, and continued to reside thereon; .that this agreement was made and the deed executed in consideration of love and affection for his son, of his conduct aforesaid, and of the said sum of $5000 paid to him by his son; he denies that at the *time of this agreement* he was indebted to any one. The answer of Samuel Worthington, .the son, is to the same effect, and that he went into possession of the land *in pursuance* of this *agreement*, paid the $5000, and received his deed in March 1825. Now it is insisted on this state of facts that this is not a mere *voluntary* agreement .to convey, but an agreement to convey on a *fair and valuable consideration*, and that the deed of March 1825 relates back to the time of this agreement.

Both answers assert that the son was put in possession of the land at the time of the agreement in 1817, and in *pursuance of the agreement.* If a party can prove a contract in relation to lands and that it has been in part performed, he is entitled to have it specifically executed, not because *part performance* is a compliance with the statute of frauds, but because it takes the case entirely out of the statute. At the time the agreement here was made, and at the time of its part execution by possession taken by the son, there *were no creditors;* the father was entirely free from debt. The existence of the contract and the part performance must be made out by clear and satisfactory proof, and the act of part performance relied on must be of the identical contract set up. 1 *Johns. Ch. Rep.*, 131, *Philips vs. Thompson.* The proof in this case brings it precisely within these principles. In pursuance of the agreement of 1817, the son, in the fall of that year, was put in possession of the *very land* his father had bought for him. He proceeded to put improvements upon it, cultivated it, and remains in possession of it to the present day. See 11 *G. & J.*, 314, *Moale vs. Buchanan.*

It will not I suppose be contended that this deed is inop-

erative as to creditors *subsequent to its date,* unless it be made to .appear *affirmatively* that its express design was to defraud such creditors.    The position assumed by the bill is, that it is void as to creditors existing at the time of its date.    Now suppose, *argumenti gratia,* there were creditors existing at the date of the deed as well as of the agreement in 1817, it does not follow that the deed would be void on that account. The doctrine of Chancellor Kent, in the case of *Reade vs. Livingston, 3 Johns. Ch. Rep.,* 500, is repudiated by the decision of the Supreme Court of the United States, of the courts of several of the States, and by the Court of Appeals of Maryland, and the well established doctrine now is, that even in *voluntary* settlements the fact of indebtedness at the time does not, *per se,* constitute a substantial ground for invalidating them on the ground of fraud, but is *prima facie* only, and not conclusive evidence of a fraudulent purpose even with respect to a *prior creditor,* and that this presumption may be repelled by showing that the grantor at the time of the gift was in prosperous circumstances, possessed ample means to discharge all his debts, and that the settlement upon the child was a reasonable provision according to his or her condition in life. 11 *Wheat.,* 199, *Hinde vs. Longworth.*   1 *Conn.,* 525, *Salmon vs. Bennett.*   5 *Gill,* 460, *Worthington vs. Shipley.*   Such was the case here as disclosed by the answer of the father, even at the date of the deed in 1825, and this statement is not satisfactorily rebutted by any other proof in the cause. But be this as it may, it will be observed that I do not place the son's right to the property exclusively upon the deed, but on the agreement of 1817, and possession under it, *at which time* there were *no debts.*

The answers are consistent with each other, but it has been attempted to overthrow them, and now the question is, has this been done?   Are there *two witnesses* here to overrule these answers? is there *one* witness with pregnant circumstances? is there *one witness* ?   I submit there is not.   There is not only no witness, but there is no *intrinsic* evidence to be found among the proceedings and exhibits in the cause

which, when carefully examined, will be found to militate against the sufficiency and integrity of the answers, and the validity of the deed. The witnesses examined lived in the neighborhood of the parties, and, on a full examination of their testimony, no fact will be found from which even an *inference* may be drawn that the deed was not executed on a fair, legal and valuable consideration, and in good faith in regard to creditors.

The deed on its face calls for the consideration of $12,000, and this is the only consideration mentioned in it. Now it is conceded, that the answers state that the moneyed consideration which was to be paid was $5000, but it must be remembered that they state further and say, that *in addition* to this was the valuable consideration of services rendered. Is this misrecital of the precise ingredients of which the consideration was made up fraudulent *per se*, and on that account destructive of the conveyance? On the authority already referred to, (2 *H. & G.*, 431,) its utmost effect would be to subject the instrument to a rigorous scrutiny. Now if fraud was designed in inserting the consideration of $12,000, it is strange that the parties who perpetrated it should be the first *voluntarily* to disclose its existence. Their answers do not attempt to sustain the consideration as set out in the deed, but they go into a full and detailed statement of the *circumstances* under which it was executed. If they had been so reckless of their characters as to insert a false consideration with a view to a fraud, the step would not have been difficult to have gone further, and to have sworn to it in their answers, but they do no such thing. The circumstances detailed in their answers bear with them the impress of their truth, and clearly indicate that the statement in the deed was not conceived in fraud. The more natural inference from them is, that the exact consideration was not thought to be legally important, or that the *services* may have been estimated in money, in making up the sum named.

The defence taken and the evidence introduced here, is not designed to *contradict* and *vary* the consideration mentioned

in the deed, but to show an *additional* valuable consideration
to the $5000, which the answers admit was the moneyed con-
sideration for the deed.    The ground taken by us is, that
there was a moneyed consideration for the deed, and superad-
ded to that we say was the valuable consideration of services
rendered, which is not *inconsistent* with the consideration of
the deed, but which *stands with it:* and this it is competent
for the parties to aver and prove, as the cases already cited
show.    The deed is assailed for fraud, and in that case it is
competent for us to show all the circumstances with a view
to rebut the inference of fraud, and to do this we may offer
proof of any consideration.    9 *G. & J.*, 91, *Clagett vs. Hall.*
1 *Gill*, 423.    The bill asks the defendant from what source
the means were derived, to make payment of the amount
professed to have been paid?    The answers and the testimony
show, that Samuel Worthington was an industrious, hard
working and economical man, that in addition to the usual
products of his farm, he sold therefrom large quantities of
limestone and lime, that he sold a part of the land and paid
the money to his father, that he borrowed some from his rela-
tives and obtained some from the sale of negroes.    It must
be remembered also, that he went into possession of the land
in 1817, and that the entire purchase money was not paid
until 1825.    Is it remarkable that on such a farm, with such
habits, he should have been able within this period to have
liquidated this indebtedness?

I conclude this point, having attempted to show that the
deed of March 1825, was not a *mere voluntary* deed, that it
*relates back* to the agreement of 1817, that both the agree-
ment and the deed are based on *a fair and valuable considera-
tion*, and that there is *no creditor* of Walter Worthington in
a condition to complain.

The learned counsel then proceeded to argue the question,
as to the validity of the deed of September 1826, and espe-
cially whether it was fraudulent under the insolvent laws.    As
to this he contended, that the deed having been executed
prior to the act of 1834, was to be tested by the act of 1812,

and that to avoid it under this act, there must exist both the *intent to prefer* and the *intent* to take the benefit of the insolvent laws, and that the answer is conclusive as to the question of intent, unless rebutted or overcome by other testimony. Upon this point he cited 3 *Coke's Rep.*, 81, *Twyne's case.* 5 *G. & J.*, 377, *Hickley vs. Farmers and Merchants Bank.* 2 *H. & G.*, 416, *Hudson vs. Warner & Vance.* 6 *G. & J.*, 205. *Ibid.*, 323, *Crawfords vs. Taylor.* 7 *Do.*, 170, *Hoffman vs. Dulaney.* 9 *Gill*, 177, *Malcolm vs. Hall.* *Ibid.*, 218, *Beatty vs. Davis.* 3 *G. & J.*, 433, *Roberts vs. Salisbury.* He then proceeded to show from the facts and proofs in the case, that the deed was valid upon the principles above stated.

*Reverdy Johnson, Jr.*, and *S. Teackle Wallis* for the complainants, the creditors, argued at length the following points.

1. That the validity of the deeds of March and June 1825, is to be tested by the circumstances existing at the time when the deeds were executed, and not at the time of the alleged parol agreement in 1817, or the pretended bond of conveyance some time between 1817 and 1822. That this parol agreement if it ever existed, was merged in the bond of conveyance subsequently given. 1 *Johns. Ch. Rep.*, 273, *Parkhurst vs. Van Cortland.* The bond, if it ever existed, not having been known or put of record, and there having been no notice, actual or constructive, to any one, of the agreement, creditors cannot be bound by the one or the other.

2. That the existence of the bond is not proven by any admissible evidence, it not having been produced or its absence accounted for, and that the agreement, if it ever was made, was without consideration, could never have been enforced, and can be the foundation of no equities here. *Griffith vs. Frederick County Bank*, 6 *G. & J.*, 439. 1 *Sugden's Vend.*, 442. *Jackson vs. Ligon*, 3 *Leigh*, 187, 188. 9 *Gill*, 326, *Clements vs. Ruckle.*

3. That the deed of March 1825, sets up as its basis a moneyed consideration of $12,000, and all the defence taken

and evidence introduced to contradict and vary the alleged consideration, and show that the true consideration was $5000, in money, and the balance in natural love and affection, are inadmissible in a proceeding to avoid the deed for fraud. 6 *H. & J.*, 276, *Hurn vs. Soper.* 3 *Md. Rep.*, 340, *Baxter vs. Sewell*, and 2 *Md. Ch. Dec.*, 455. *Betts vs. Union Bank*, 1 *H. & G.*, 203. *Clagett vs. Hall*, 9 *G. & J.*, 91. *Harris vs. Alcock*, 10 *G. & J.*, 248, 249. *Cole vs. Albers*, 1 *Gill*, 423. *Henderson vs. Mayhew*, 2 *Gill*, 393.

4. That the deed of March 1825, was fraudulent in fact, the result of a conspiracy between the father and son to postpone and defraud the creditors of the former, for the benefit of them both. If any money was paid by the son to the father, it was in fact the father's own money, obtained by the son from sale or mortgage of the very land conveyed to him, and from stone and timber taken and cut from it.

5. That the deed of March 1825, was, at all events, without consideration, or without sufficient consideration, and fraudulent on that account against prior creditors. The whole evidence, it will be contended, demonstrates that Samuel Worthington never was in a pecuniary situation to make to his son such an advancement as the property in question; that at the time of the execution of the deed of March 1825, he was deeply involved and greatly embarrassed; that he had previously sold or mortgaged, to its full value, all his other property of any importance except what he conveyed to Samuel; that he was perfectly aware of his situation and made the conveyance in view of it; that he was immediately afterwards sued for undisputed debts, which he never paid, and subsequently applied for the benefit of the insolvent laws, without being in any worse condition than he was when the deed was made. *Worthington vs. Shipley*, 5 *Gill*, 456, 460.

6. That the bill of sale of September 1826, was fraudulent and void, without consideration or *bona fides*, and made to hinder and defraud creditors, when the grantor was in circumstances utterly insolvent, without hope or prospect of extrication. That the fraud of said bill of sale is apparent

24    v.6

on its face, in the provision which it makes for the payment of the alleged consideration money, $4000, with interest from June 2nd, 1825, when from all the evidence of the Worthingtons themselves, it appears that if the sums of money which are alleged to have made up that consideration were ever paid, they were so paid, at various times and in various amounts, all subsequent to June 2nd, 1825, that said interest was therefore fraudulently charged; that such fraudulent charge illustrates the whole character of the instrument, and the possession by the grantor of the property conveyed, down to the time of his insolvency, makes the purpose of the transfer too clear for controversy.

7. That it was made without request on the part of Samuel, and at the special suggestion of Walter Worthington himself, in order to give an undue and improper preference to Samuel Worthington, in contemplation of the grantor's insolvency.

8. That it was at most a mortgage, and the permanent trustee, is entitled to a decree for the possession and sale of the property. *Alexander vs. Ghiselin*, 5 *Gill*, 181.

*John Nelson* for Worthington, in reply.

There are two subjects of discussion in this case:—1st, the deeds of the realty, and 2nd, the deed of the personalty. The first are assailed upon two grounds, 1st, actual fraud as between the father and the son; 2nd, constructive fraud under the statute of Elizabeth; the latter is assailed upon the ground, 1st, of actual fraud, and 2nd, as a fraudulent preference under the insolvent laws.

The question of actual fraud is one of fact, that of constructive fraud is also a question of fact dependent upon certain clearly defined legal principles; 1st, that no deed made to defraud creditors can be enforced against them, and 2nd, that voluntary conveyances are *prima facie*, but not absolutely void, as against prior creditors. Such deeds are good *inter partes*, and void only when they delay creditors, and this depends upon the question, whether the party was in circumstances to enable him to make the conveyance.? 1 *Amer. Lead. Cases*, 33. 5 *Gill*, 449, *Worthington vs. Shipley*.

The deed here professes to be founded upon a moneyed consideration of $12,000. The answers responsive to the bill concede that only $5000 was paid. All that the cases decide in reference to evidence touching the consideration of deeds is, that you shall not *change the whole character* of the deed by such evidence. Such was the decision in the cases of *Betts vs. The Union Bank*, and *Cole vs. Albers & Runge*. If a deed is given for a substantive moneyed consideration, it is a deed of bargain and sale, no matter what other considerations there may be, and when such a deed is assailed for fraud, the party may prove such other considerations in support of it. 1 *Md. Ch. Dec.*, 395, *Elysville Manf. Co., vs. Okisko Co.* Such is the case here. Reliance is placed upon evidence *aliunde*, and it is competent to offer such evidence to *rebut* the imputation of fraud.

But a portion of the evidence of Walter Worthington, the father, relating to the bond of conveyance is objected to. But this evidence was brought out by the complainants themselves upon their own cross-examination, and where a party brings out by his own examination facts otherwise inadmissible, he makes them evidence—they are *his own* evidence. 2 *Bland*, 192, 193. 7 *G. & J.*, 397, 398, *Boteler & Belt, vs. Beall.*

Now what is the case upon the pleadings and proofs? The bill alleges the consideration to be fraudulent, and the defendants are called upon to answer this allegation. The answers, responsive and therefore evidence, allege and set out the consideration. They state that in 1817, the father made an agreement to buy and give his son this tract of land, and gave him possession of it; that the son entered and made large improvements upon the land, and remained in possession for eight years ; the products of all the land went to the son. Under such circumstances could not the son have compelled the father to execute to him a conveyance? It was a parol contract executed in 1817, by part performance. *Story's Eq.*, secs. 760, 761, 762.

But it is said the bond of conveyance merges the parol

contract. How merge it? It was nothing but written evidence of the obligation to convey in pursuance of the previous parol contract. But if the bond is to be looked to, what was the father's condition then in 1822? Mrs. McKim was his only creditor then, and she only to the amount of $800. What was his condition in 1825? He then owed in March of that year $800 to Mrs. McKim, and this, except upon a contingent liability on a trustee's bond, was all he owed. Under this bond two debts were recovered of $361.20, which, with the $800, makes $1161.20. Other debts of $400 were incurred in May 1825. All the other debts amounting to $1213.16, were incurred after the date of the deed, and were the debts of his son Charles, of which he had no knowledge at the date of the deed. Now what was his property worth at that time? He says $80,000 or 90,000, and this is explained by the proceedings in insolvency invoked by the other side. The application was made in January 1828. In his schedule he returns his creditors and his property. He held the farm on which he lived, containing 450 acres, upon which he raised the sum of $23,000 in 1825. Was not this sufficient to pay the $1161.20 indebtedness? Do these facts furnish in opposition to the answers conclusive evidence of fraud?

To avoid a deed under the insolvent laws, you must show both the intent to prefer and the intent to apply for the benefit of the laws at the time of the conveyance. A party's answer as to the question of *intent* is *conclusive*, unless rebutted or overcome by other testimony. The deed of the personalty cannot be successfully assailed on this ground; it was executed upon the express solicitation of the son.

After the cause had been argued as above, at the suggestion of the court, a further argument was had upon the question: "Supposing the case made by the answer of the defendant, Samuel Worthington, to be made out, and no deeds executed by Walter Worthington, is it such a case as a court of equity, on the application of Samuel Worthington, would decree a

specific performance *against the creditors of Walter Worthington?*"

Upon this question it was argued by the counsel for the defendant, Worthington, that equity would decree specific performance against creditors.   It is to be remembered that Samuel is a defendant in possession of the property, not asking the active interposition of the court in his behalf. Under such circumstances a much weaker case will constitute a good defence than would be required of him if he were complainant, asking the interposition of the court in his behalf. 4 *Md. Rep.*, 317, *Crane vs. Gough.   4 Md. Ch. Dec.*, 133, *Haines vs. Haines.*   But supposing he was a complainant, asking specific performance against the creditors of his father, we hold that under the case made out in the answers he would be entitled to it.

1st. As to the contract:   The answers show that it was made, that its terms were clear and definite, and that the acts done under it were also clear and definite.   It cannot be regarded as a mere voluntary contract between parent and child, but was based not only on good but on a valuable consideration.   Samuel was put in possession of the land in pursuance of the contract, and proceeded at once to construct improvements upon it.   It is not necessary that money should have been paid, if it was expended on the land on the faith of the contract, it constitutes a valuable consideration.   9 *Pet.*, 204, *King vs. Thompson.   9 Gill*, 32, *Sheppard vs. Bevin.* Here, not only money was expended on the land on the faith of the contract, but money was actually paid on its faith to the amount of $5000.   But even if the contract had been voluntary it would have been good against every body.   The father at the time was free from debt and in affluent circumstances, and the statute of Elizabeth only declares *fraudulent* conveyances void.   1 *Story's Eq., sec.* 353.   A voluntary conveyance to a stranger, made *bona fide* by a party not indebted at the time, is good against subsequent creditors.   1 *Madd. Ch. Rep.*, 227, *Holloway vs. Millard.* 1 *Atk.*, 93, *Walker vs. Burrows.*   There is the same moral obligation to perform

the contract when made verbally as when made in writing, and the legal effect of its terms are the same in one case as the other. 5 *Gill*, 181, *Alexander vs. Ghiselin. Ibid.*, 483, *Baynard vs. Norris.* 11 *G. & J.*, 324, *Moale vs. Buchanan.* 3 *Gill*, 137, *Rogers vs. Scarff.* 2nd. As to creditors: There were no prior creditors at the date of the contract, and its part performance in 1817. As to subsequent creditors, the equity of Samuel under his contract, possession and performance, is superior to theirs, whether they be general or judgment creditors. He had a specific lien on the property, whereas even a judgment creditor has only a general lien. An agreement for a conveyance is a specific lien against creditors. 11 *G. & J.*, 314. 3 *Dessau* , 74, *Poloney & Read, vs. Keenan.* 12 *G. & J.*, 478, *Richardson vs. Stillinger.* 5 *Gill*, 182. 6 *G. & J.*, 381. 2 *Vernon*, 564, *Taylor vs. Wheeler.* 4 *H. & J.*, 136, *McMechen vs. Maggs.* 1 *Peere Wms.*, 277, *Finch vs. Earl of Winchelsea.* 12 *G. & J.*, 344, *Repp vs. Repp.* 2 *H. & J.*, 64, *Hampson vs. Edelen.* The case in 9 *Pet.*, 204, and the cases cited above, are conclusive of the superior equity of Samuel, and of his right to a decree for specific performance. If Walter was alive he could not successfully resist it, and his creditors, it is conceived, occupy no stronger position. They became such after Samuel was put in possession, and if after that they dealt with Walter, they did so at their own peril. His possession was notice to every body as much as a conveyance or recordation could have been. The agreement to convey alone would have been good against creditors if they had notice. 10 *G. & J.*, 324. 2 *Hill's Ch. Rep.*, 428, *Massey vs. McIlwain.* 3 *Ves.*, 573, *Burn vs. Burn.* 16 *Do.*, 249, *Daniels vs. Davison.* 5 *Gill*, 468, *Baynard vs. Norris.* 3rd. The contract and the acts of part performance being clearly made out, a court of equity not only had the power, but would have been warranted in decreeing specific performance. Equity not only has the power, but will enforce it to decree specific performance of a contract made *bona fide* and in part executed against creditors having no priority of lien. 5 *Gill*, 181. Here we insist there were no such creditors,

Samuel in good faith performed his part of the contract; he paid the $5000 to his father, and if he were asking specific performance, we should support his claim to such decree with confidence as against all objection, upon the well established rule "that equity regards as done that which was agreed to be done."

*The counsel* for the creditors:—Would such a decree have passed as against Walter, and *a fortiori* against his creditors?

A preliminary difficulty which we regard as absolutely insurmountable suggests itself. It grows out of the statement of the answer, that the agreement set up was embodied by the parties in a written paper, which is not produced or satisfactorily accounted for. No case can be found where, on such a state of facts, equity has ever exercised the power of enforcing the execution of a deed. Upon the most familiar principles of law the written expressions of the agreement between the parties must have superseded, and, for the purpose of proof, abrogated utterly all previous parol understandings. The written paper was *the contract*, and in its absence, unaccounted for, the bill for specific execution would have lacked the first element of proof to sustain it, viz., proof of a contract to be enforced. Equity will never interfere unless it appears "clearly *what was the agreement*" sought to be enforced. 2 *H. & J.*, 76, *Wingate vs. Dail.* 1 *Gill*, 393, *Hall vs. Hall.* 4 *Md. Rep.*, 462, *Murndorff vs. Kilbourn.* 2 *Story's Eq.*, sec. 764. 5 *Gill*, 182. In view of this principle Samuel Worthington could not have been successful under a bill which set up an agreement reduced to writing, but never produced or proven as set up by evidence reco' nized by the law. The absence of the writing would have constituted, *per se*, a fatal defect of proof in the most vital and fundamental point.

But suppose the agreement proven, would it have been enforced? In the outset it was clearly without consideration. The father was entitled to the son's labor. The son was his servant *de jure*. 5 *H. & J.*, 31, *Mercer vs. Walmsley.* The promise of the father was therefore simply an engagement to

pay for what always belonged to him, and what he had long before received as his own. Thus far then the agreement was voluntary and could not be enforced. 2 *H. & G.*, 100.

But it is said money and labor were actually expended on the land, and money was paid for it on the faith of the contract. 9 *Pet.*, 204, and 9 *Gill*, 32, are referred to to show that repairs and improvements in such case constitute a valuable consideration. But in those cases the parties expended their *own* money on the land. In both money was *put upon* the land. Here it was first *taken from* the land. Without a dollar on earth a son just reaching his majority is placed in possession of a farm worth nearly $22,000. During eight years possession, without any other means whatever, he is enabled, from the mineral and agricultural resources of the farm, its stone, lime, timber and grain, to build certain improvements on the property, and to pay $5000, less $1000, which was derived from a sale of a portion of the very property itself. Is this the payment of a valuable consideration? Is this expending his own money on the land? Suppose instead of selling $1000 worth of the land he had sold $5000 worth, and his father had joined in the deed and received the money, would any court have regarded that as payment of $5000 purchase money by Samuel, and decreed specific performance on the strength of it? Suppose the father had given his son $5000 to be *paid back* again, would that have been a valuable consideration paid by the son? And where is the difference in principle between giving the money and giving the money's worth? This bill must have been dismissed for *gross inadequacy of consideration*, (1 *Sugden on Vend.*, 442,) or on the equally familiar ground that the contract was not reasonable, fair, or proper to be enforced. 2 *Story's Eq.*, secs. 769, 770. 6 *G. & J.*, 439, *Griffith vs. Frederick County Bank.*

But this is not all. No contract will be enforced unless it contain "the essential ingredient of *mutuality*," unless it would give *both parties*, the one as well as the other, the right of compelling execution. 4 *Gill*, 476, 477, *Geiger vs. Green.* By this contract the father offers to *give* the whole if the son

chooses to pay in part. The son has *the right to decline* and has entered into no *obligation* to take or pay. There is no principle on which the father could have rested to enforce a specific performance, because there was no contract on the son's part to be performed. Neither the answers nor the proof suggest that the son bound himself to accept his father's bounty. There is no allegation of any contract on his part.

These views are tenfold stronger when applied to a bill seeking specific performance as against the equities interposed by the creditors of the father. The enforcement of specific performance rests altogether in the discretion of the court, and this discretion is never exercised where its application and results would be inequitable, (4 *Gill*, 475, *Geiger vs. Green.* 8 *Gill*, 263, *Waters vs. Howard*,) and this court has furnished its own test of what is equitable in the premises. In *Hall vs. Hall*, 1 *Gill*, 389, 390, following *Hamilton vs. Jones*, 3 *G. & J.*, 127, it is determined, that equity will not interfere to compel performance, except in cases where to withhold such interposition, would be to *assist the party recusant in perpetrating a fraud.* The governing rule is, that "nothing is to be considered as a part performance, which does not put the party into a situation which is a *fraud on him* unless the agreement is fully performed." 2 *Story's Eq.*, sec. 761. How could the son here, even against his father, allege that to refuse enforcement would be a fraud on him, when he had enjoyed a large estate for eight years from his father's bounty, paying no rent or interest on the purchase money, receiving all the profits, and paying, by improvements and payments, a sum not two-thirds of the interest which the purchase money required his father to supply? and as against creditors, what fraud would it be to say that he should not have for $5000 an estate worth $22,000, when they would be left remediless by the abstraction from his father's resources of the $17,000 thus demanded?

But it is said that *possession* under an agreement in writing with payment of purchase money will justify a decree for specific performance as against intermediate creditors. But what sort

25    v.6

of "*possession*" had Samuel Worthington to bind creditors, by the public suggestion and promulgation of his rights which possession is supposed to furnish? In 1817 he took possession, the equitable title still being in his father under the trustee's sale. In 1821 the father completed the payment of the purchase money *and took the trustee's deed to himself*, which he duly recorded. Here was an assertion to the world of title in the father adverse to the son's possession. What right, after that, had any one to presume that the son's possession was in virtue of a claim of title? Could such a possession so begun, maintained and qualified, justify any court of equity in shutting creditors out? Would such a thing be just, fair, equitable, reasonable, in support of a voluntary contract? How could the court escape the conclusion, that under such circumstances as against creditors, the son had been guilty of laches in delaying any promulgation of his claim for eight years; laches "unexplained by equitable circumstances," and such as would furnish ample ground to dismiss a bill for specific performance? 2 *Story's Eq.*, sec. 771.

MASON, J., delivered the following opinion, upon the appeal of Worthington.

This proceeding had its origin in transactions that took place nearly forty years ago, and the bill itself was filed as far back as a quarter of a century. Thus it will be seen that we are required to deal mainly with the acts and doings of those who are now no more. Most of those who were participators in these proceedings in their origin—the court, parties, counsel, witnesses and officers—have passed from the active scenes of the fallible courts of this earth, to the solemn, silent and unerring tribunals of the other world.

The chancellor has truly remarked that this case is one of importance, not only with reference to the amount of property involved, but also as regards the propositions to be decided, embracing as they do important principles of law, as well as delicate questions of morality and character.

We have carefully examined the able opinion of the chan-

cellor, and we fully concur with him that most of the points presented by this record, have been fully settled by cases heretofore adjudicated in Maryland, and we therefore adopt the conclusion to which he has arrived.

The point in this case, which is attended with the most difficulty, as we conceive, is that which relates to the *parol agreement*, between the father and the son, of 1817, which, as is alleged, formed the basis or consideration for the subsequent deeds of 1825. Conceding that this parol agreement was a valid one, by reason of its having been partly executed, and that a further specific performance of its other provisions would have been decreed by a court of chancery, still, notwithstanding its having been partly performed at the time it was entered into, it continued, nevertheless, executory in its character, and as such, it was competent for the parties to have reduced it to writing, and thus to have merged the original parol contract into a written agreement, or even to have substituted an entirely new written contract, in the place of the one which originally rested in parol: and when this has been done the verbal agreement becomes merged in the written contract. Can these plain propositions be doubted, or is it necessary to invoke authorities to support them?

It is said by the defendants' counsel, that this is not an attempt to explain or defeat a written contract by proof of a parol one, but that it is a proposal to set up a valid, perfect, independent parol agreement, which has been in part executed. We concede this to be within the power of the defendant, if he had thought proper to rest his case upon such an agreement. But this he has not done. The witness that established this verbal contract, goes further, and proves that *subsequently a bond of conveyance* was executed, by the assent of both parties, the purpose of which was to effectuate if not extinguish the parol agreement. Until this bond is produced, we cannot tell what were its precise provisions and legal effect. Suppose it had referred to the parol agreement, and had professed upon its face to have been a literal transcript of it, could there be a doubt that it would have been

a complete extinguishment of it, and that all parol evidence of the first agreement would have been inadmissible? This principle is conceded in the case of *Jones vs. Hardesty*, 10 G. & J., 416. In that case in pursuance of a verbal agreement, an assignment *in writing* had been made, and it was contended that the former was merged in the latter. But this view was not sustained by the court, on the ground, expressly, "that it was nothing more than an act done by one of the parties in execution of the oral agreement into which he had entered." This other general principle however is clearly recognised; "if the oral contract referred to had been reduced to writing by the parties, or if it was intended that the assignment should be such written contract of the parties then might it be contended, in the absence of all proof of fraud, surprise or mistake, that the oral evidence offered by the appellee was inadmissible."

But it may be said that there was no evidence that such was the nature and purpose of the bond. Concede this also: yet it is clear from the proof that it related to the same subject matter with the *parol agreement*. Concede further that it was inconsistent and repugnant to the agreement. In such an event which should control? The bond, clearly, and if for no other reason than because it was of subsequent date. If both the bond and agreement were of equal dignity—for example, under seal—the last, even in such a case, must control the first. This principle is settled in the case of *Dorsey vs. Smith*, 7 *Har. & Johns.*, 363, and is thus stated: "The first instalment due by Dorsey on the original contract for the sale of the lands was paid, and before the second instalment became due Dorsey entered into a bond, conditioned for the payment to Smith of the residue of the purchase money. . . . . . Thus by this contract there seems to have been a partial modification of the original agreement as to the payments, and being the last stipulation, must be considered as binding on the parties."

If then one written agreement is to control another, inconsistent with it, between the same parties, because of its being

of a later date, *a fortiori,* should a bond, under the same circumstances, control an oral contract.

Nor can it be said that the bond, as in the case of *Jones vs. Hardesty,* before cited, was executed in pursuance of, or in part performance of the verbal agreement. The latter, as established by the witness, does not contain any stipulation that a bond was to be executed, nor was any necessary to effectuate the oral agreement, as was the case in *Jones vs. Hardesty.* In any aspect therefore in which this bond can be viewed, upon the testimony before us, we must regard it as a written copy of the original verbal agreement, or as a new contract substituted in the place of the first, and in either case must control by its terms and provisions the rights of the parties, in opposition to any conflicting provisions embraced in the previous verbal contract.

In order to know, as we have before said, what was the character and legal effect of this bond, it should have been produced, or its absence accounted for, or explained. Without its production, or some satisfactory explanation of its absence, the defendant cannot advance with his case. We therefore concur with the chancellor, in the first place, that the alleged parol agreement of 1817, if it related to the land now in controversy, was merged and extinguished, or at least suspended, by the bond of conveyance which was afterwards executed; and secondly, that the bond not having been produced, nor its absence explained, parol evidence of its contents, or of the terms of the original agreement, would not be admissible. Nor can we discover that the alleged cross-examination of the witness by the complainants' counsel, was of such a character as to remove the objection to the testimony. We have attentively considered the views of the chancellor upon this point, and fully concur in them.

The validity therefore of the defendants' title to the real estate in question, must depend upon the condition of the parties, and the state of facts, as they existed at the time of the execution and delivery of the deeds of 1825.

It is conceded that the actual *money* consideration which

passed between the parties to the deed, was $5000, and that that sum fell far below the real value of the land covered by the conveyance. But it has been strongly urged in argument, that this fact was an immaterial circumstance, and that a deed, if it rests upon a moneyed consideration, must be supported, even though that consideration bears no adequate relation to the real value of the property. This proposition, as a universal rule, is not correct, so far at least as third parties or creditors are concerned. It is true it gives to the deed, in contemplation of law, the character of a bargain and sale, and subjects it to all the rules of interpretation and the like, which govern such instruments. Nevertheless a deed valid in all respects as between the parties, may be assailed, in chancery by creditors, solely upon the ground of inadequacy of consideration; as for example, where land is sold and conveyed at private sale, as this was, and a consideration in money received therefor palpably less than its real value, or what it would bring at public sale in the market. Under such circumstances, a court of equity will regard the transaction as evidence, either of fraud, or a design on the part of the grantor to make a gift to the grantee of the difference between the price paid, and the actual value of the property, and if the latter, the deed to the extent of the difference, must be regarded as voluntary, or resting upon the consideration of natural love and affection. If this were not so, fraud could be perpetrated upon creditors with impunity, by converting deeds based in fact upon considerations of love and affection, into those which rest upon a moneyed consideration, by merely agreeing to receive a trivial price in money for the property sold. Whether such a voluntary deed can be supported or not, must depend upon the condition of the grantor at the time of its execution. If, therefore, at the time of the execution of the deed the grantor had creditors, who would be hindered, delayed and exposed to expense and difficulty in collecting their debts, by reason of the deed, even though the grantor was not in fact insolvent, still so far as it was voluntary, or rested upon the consideration of natural

love and affection, it would be void.   We think it clearly appears that such was the condition of Mr. Worthington, the senior, when the deeds to his son were executed, in 1825, and consequently they were void as to creditors, who were such before and at the time.

We have not said, nor do we design to intimate, that the deed in question was in fact fraudulent in its inception.   We pronounce it void, because of the fact alone, of its having been a voluntary conveyance, made at a time when the grantor was indebted, and that that indebtedness still exists.

There are other points presented by this record, and which have been considered by the chancellor, to which we do not deem it necessary to refer, for the purpose of either affirming or denying.   We have said enough in this opinion to dispose of the case, as now presented, and accordingly we feel constrained to affirm the decree.

*Decree affirmed, with costs, and cause remanded for further*
        *proceedings, to the circuit court of Baltimore county.*


ECCLESTON, J., delivered the following separate opinion, concurring in the affirmance of the decree :

The conveyance bond, mentioned in the proceedings, I do not think is properly in evidence before us.

Whether the proof in regard to the alleged parol contract or agreement of 1817 can be considered as in the cause, notwithstanding the deed of 1825, I deem it unnecessary to decide, because, admitting it to be before us, nevertheless, under the circumstances disclosed in the record, the acts which are relied upon as part performance of that agreement, cannot, in my opinion, authorize a court of equity to sustain the claim of Samuel Worthington in opposition to the claims of the complainants as creditors of his father.

I think the decree of the chancellor should be affirmed in regard to the deeds of 1825, and also in reference to that portion of it which directs the bill to be dismissed so far as relates to the deed of the 8th of September 1826, from Walter to Samuel Worthington.

Worthington vs. Bullitt, et al.

LE GRAND, C. J., dissented, and delivered the following dissenting opinion:

I dissent from the opinion pronounced by my brother MASON, in this: I am of opinion the parol agreement of 1817 is sufficiently proven, and that it was executed far enough to entitle Samuel Worthington to invoke a decree for its specific performance, by the execution of a deed from Walter Worthington on the payment of the consideration stipulated.

There is nothing in the record to show Walter was indebted at the time of the inception, nor at the time of the partial execution of the contract, by putting Samuel in possession of the land; and I cannot therefore understand how creditors—becoming such years after the date of the contract—can claim to have it set aside without proof of actual fraud.

The circumstance that Samuel derived from the product of the land the means to make the payment for it, ought not to weigh against his pretensions when unaccompanied by circumstances showing an intention to defraud those who should thereafter become the creditors of Walter. In my judgment, the evidence is wholly inadequate to show any such fraudulent intention. It is no unusual occurrence for persons to purchase land on credit, and to pay for it out of its yield; a yield owing, in some cases, to an increase in the value of property, but more frequently ascribable to the judicious management of it. Transactions of this kind are very common in large cities and their neighborhoods. Indeed, it is matter of notoriety, that very large fortunes have been thus acquired, and, yet, it never has been supposed by any one that such transactions are colored with fraud: so far from it, they are regarded as evidence either of the good fortune, or of the diligence and sound judgment of the purchaser, or of both. The only questions, as it occurs to me, are:—1st. Was there a contract for the sale and purchase of the farm? 2nd. If so, was it sufficiently executed to take it out of the statute of frauds? And 3rd. Is there a deficiency of proof to establish fraud on the part of either Samuel or Walter Worthington, or both, at the time the contract was made and partly executed? Looking to the

record, and avoiding conjectures and surmises, I think all these questions should be answered in the affirmative, and am, therefore, of opinion the chancellor's decree, in so far as it relates to the farm, ought to be reversed.

Mason, J., delivered the opinion of the court upon the appeal of Bullitt and others.

This is a cross-appeal, and a branch of the case of *Worthington vs. Bullitt and others,* already determined, both cases having been considered by the chancellor in one opinion, and embraced in the same record. This branch of the case involves merely the validity of the bill of sale from Walter Worthington to his son Samuel, dated September the 8th, 1826, of certain negro slaves for the consideration of $4000. This conveyance is assailed upon the ground that it was made to hinder and defraud the creditors of Walter Worthington, the grantor, or in contemplation of insolvency. This whole case must depend upon the evidence, which we have examined attentively. We can discover no proof in the record to support the allegations of the bill, or to contradict the defendants' denial of the fraud imputed to them. On the contrary we think the whole evidence, taken together, tends affirmatively to show that the transaction between these parties was *bona fide* and honest.

We think the chancellor was right in sustaining this conveyance, and we therefore also affirm his decree upon this branch of the case.

*Decree affirmed, with costs in this court.*