ROSENHEIMER, Appellant, vs. KRENN and others, Respondents.

*December 16, 1905—January 9, 1906.*

*Fraudulent conveyances: Findings: Evidence: Unpaid purchase money: Rights of general creditors: Inadequacy of price: Charging purchaser as trustee: Taxation of costs: Separate bills: Discretion.*

1. Findings of the trial court, to the effect that a conveyance of land was not made with intent, on the part of either grantor or grantee, to hinder, delay, or defraud creditors of the grantor, and that it was not induced by fraud or duress, are *held* not to be against a clear preponderance of the evidence.

2. Where a sale of land is valid the purchaser is not bound, upon learning of a debt of the vendor to a general creditor, to withhold for the protection of such creditor any part of the purchase money which may be unpaid. If a general creditor would reach purchase money due on such a sale he must impound it by garnishment or other similar process.

3. Assuming the existence of a rule by which, when property is sold for a price known by both vendor and vendee to be less than its real value, the conveyance may, under some circumstances, be held voluntary to the extent of the difference between value and price and the vendee be charged with such difference as a trustee for the vendor's creditors, yet such rule does not apply where no actual gift of such difference was understood or intended, no antecedent debt was paid by the transfer, and there was no fraudulent purpose on the part of the vendor.

4. Such rule, if it exists, does not apply where a farm which the trial court found to be reasonably worth $16,200 and for which the vendor, when in no haste to sell, was willing to accept $15,000, was sold for $13,000 at a time when he was anxious to make an immediate sale, to a purchaser who was unwilling to take it except at a price so low that he could be sure of selling promptly at a profit. In that situation there was no such inadequacy in the price paid as would warrant the court in setting aside the bargain made by the parties honestly and with no fraudulent intent.

5. Taxation of a separate bill of costs in favor of each of two defendants, involving duplication of items of "retainer" and

"brief," was not error, although such defendants appeared by the same attorney, where their defenses involved different issues of fact and questions of law and each was entitled to a judgment in his favor individually.

6. Taxation against plaintiff of the costs of all the findings covering the facts as to the fraud alleged in the complaint and also as to the fraud and duress alleged in a cross-complaint of certain defendants, is *held* not to have been an abuse of discretion, where all of the facts and circumstances found had a legitimate bearing upon the issues joined on the complaint.

APPEAL from a judgment of the circuit court for Washington county: JAMES J. DICK, Circuit Judge. *Affirmed.*

The defendant *Henry Krenn* was the owner of a farm of 220 acres in Washington county, together with a considerable amount of personal property, consisting of livestock, farm machinery, and crops. On August 10, 1901, he stated to the defendant *Frank Day* his desire to dispose of the same, because he found his continued existence in the neighborhood unpleasant, owing to some suspicion of his complicity in the murder of one Gehl, which had occurred about a month previous. After some discussion as to a proper price he agreed upon $15,000 as a price for the farm and personal property, and on the same day, to protect said *Day* in his efforts to find a customer, gave him a written option for ninety days at $15,000. On the 12th of August, 1901, *Day* visited said farm and a transaction took place, as to which is the principal dispute in this case, resulting in the sale of said farm and personal property to *Day* for $13,000; such sale being induced by the anxiety of *Krenn* to immediately leave the country in order to escape warrant of arrest, which he had been led to believe would be issued within twenty-four hours. Such sale was subject to mortgages for $5,900 and accrued interest; $1,800 of the purchase price was paid immediately to *Krenn,* and the rest, amounting to $5,000, was to be paid to his wife as soon as abstract could be prepared showing good title, to accomplish which *Day* gave his judgment note for

$5,000, payable on demand, to *Mrs. Krenn,* which was lodged in escrow with the scrivener, Mr. Rix, to be delivered in case the abstract showed good title. *Krenn* departed for Canada the night of the 12th, taking with him $1,500 of the $1,800 which had been paid. *Day* went into the possession of the farm, except the house in which *Krenn's* family were given permission to remain until sale was effected. The abstract was received on the 13th of August, showed good title, and said *Day* thereupon, at the urgent request of *Mrs. Krenn,* paid the amount of his note in certificates of deposit, she consenting that a $1,000 certificate be held by Rix until the amount of accrued interest on the mortgages could be ascertained. On August 14th $75 of arrearage found to exist upon one of the mortgages was paid back out of that $1,000 certificate. *Mrs. Krenn* and certain of her children left the farm for Schleisingerville three or four days later. She joined her husband in Canada some six weeks later.

On August 24th *Day* sold at auction a considerable portion of the personal property, and on August 27th sold the farm, together with the remaining personal property, to the defendant *Joseph Schwartz* for $15,000, in part payment of which *Schwartz* gave a mortgage of $5,000 to the defendant *James B. Day,* a brother of *Frank Day.* Plaintiff, who claimed to be an unsecured creditor of *Henry Krenn,* caused a writ of attachment to be issued on August 17th, which, on that day, the sheriff, being unable, as he returned, to find personal property, attempted to levy upon the farm, and perfected such attempted levy on August 22d by filing in the register's office a copy of the writ and his certificate that he had so attached. No defense being made to the suit, nor traverse to the attachment, judgment by default was entered January 6, 1902, for $795.64, and levy made on certain personal property whereby $250 were realized, and on January 15th an execution under the judgment was issued, reciting the attachment, and was placed in the hands of the sheriff and levied upon the above-

mentioned lands as the property of the defendant *Krenn.*
Thereupon, on or about February 20, 1902, this action was
commenced, alleging such levy and that the conveyance from
*Krenn* to *Frank Day* was fraudulent and with the intent on
the part of both of hindering, delaying, and defrauding the
*Krenn* creditors, and that the conveyance to *Schwartz* and the
mortgage to *James B. Day* were in furtherance of such intent
and were received with like intent by the grantees thereof,
and praying that they be canceled and set aside in order to
enable plaintiff to enforce the lien of his attachment and exe-
cution.

The defendants *Frank* and *James B. Day* and *Schwartz* all
denied any fraudulent intent by separate answers.    There-
upon the defendants *Henry Krenn* and *Theresa Krenn,* his
wife, interposed a cross-complaint in which they alleged that
*Frank Day* obtained the deed from them for a grossly inade-
quate consideration by duress and misrepresentation and with
the intent to defraud and cheat them, and that the defendants
*Schwartz* and *James B. Day* took their respective deed and
mortgage with full knowledge thereof, and accordingly prayed
for judgment setting aside said several conveyances and for
an accounting of the proceeds of said property as had been
disposed of; the *Krenns* also denying any intent of hinder-
ing, delaying, or defrauding creditors in the conveyance to
*Frank Day.*

Issue was joined upon this cross-complaint by separate
answers of the defendants *Frank* and *James B. Day* and
*Schwartz,* and a trial was had, whereupon findings were filed
negativing in great detail all the contentions of either plaint-
iff or the defendants *Krenn;* finding that there was no fraud
or duress perpetrated on *Henry Krenn,* and that there was no
intent on the part of either *Krenn* or *Day* to hinder, delay, or
defraud creditors of *Krenn,* nor any knowledge on *Day's* part
of the existence of any such creditors other than those secured
by the mortgages which were assumed by him; and accord-

ingly judgment was entered dismissing the complaint and the cross-complaint of the defendants *Krenn*. From this judgment plaintiff appeals.

For the appellant there was a brief by *Sawyer & Sawyer*, and oral argument by *E. W. Sawyer*. They contended, *inter alia*, that *Frank Day* had knowledge of claims against *Krenn* before actual payment of $5,000 of the purchase price. Such knowledge, under the circumstances, is enough to impeach his good faith. 2 Pomeroy, Eq. Jur. (3d ed.) § 603; Bump, Fraud. Conv. (4th ed.) § 184, p. 212, notes 2–7; *Jackson v. Cadwell*, 1 Cow. 622, 642; *Everts v. Agnes*, 4 Wis. 343; *Wynn v. Carter*, 20 Wis. 107, 111; *Nix v. Wiswell*, 84 Wis. 334; *Dixon v. Hill*, 5 Mich. 404; *Burnham v. Dillon*, 100 Mich. 359, 59 N. W. 176; *Hedrick v. Strauss*, 42 Neb. 485, 60 N. W. 928; 14 Am. & Eng. Ency. of Law (2d ed.) 293, subd. *c*, note 2. The giving of a promissory note which is within the control or recall of the maker, or which has not passed beyond the power of equity to relieve him, is not actual payment. *Wynn v. Carter*, 20 Wis. 107, 111; *Dixon v. Hill*, 5 Mich. 404; *Tillman v. Heller*, 78 Tex. 597, 22 Am. St. Rep. 77; *Fluegel v. Henschel*, 7 N. Dak. 276, 66 Am. St. Rep. 642; *Davis v. Ward*, 109 Cal. 186; *Nebraska Moline P. Co. v. Blackburn*, 104 N. W. 178; *Rush v. Mitchell*, 71 Iowa, 333, 32 N. W. 367; Bump, Fraud. Conv. (4th ed.) § 183, note 6; Pomeroy, Eq. Jur. (3d ed.) § 751. The conveyance was voluntary to the extent of the difference between the actual value of the property and the price paid. Bump, Fraud. Conv. (4th ed.) § 265. There is much equity in the rule that the claims of creditors should not be postponed to the profits of the speculator. The rule is based not upon the theory that the inadequacy must be so gross as to show actual fraud, but that where such inadequacy is not the result of an honest difference in opinion as to values, but is real and substantial, the conveyance, to the extent thereof, amounts to a gift. 14 Am. & Eng. Ency. of Law (2d ed.) 299; *Boyd v.*

*Dunlap,* 1 Johns. Ch. 478; *Withrow v. Warner,* 56 N. J. Eq. 795, 67 Am. St. Rep. 501; *Gnichtel v. Jewell,* 59 N. J. Eq. 651, 41 Atl. 227, affirmed *Gnichtel v. Oliver,* 44 Atl. 1099; *Worthington v. Bullitt,* 6 Md. 172, 198; *Cox v. Collis,* 109 Iowa, 270, 80 N. W. 343; *Wiltse v. Flack,* 115 Iowa, 51, 87 N. W. 729; *Bailey v. Kennedy,* 2 Del. Ch. 12; *British & Am. M. Co. v. Norton,* 125 Ala. 522, 28 South. 31; *Jameson v. Dilley,* 27 Ind. App. 429, 61 N. E. 601; *Trice v. Rose,* 79 Ga. 75. It is sufficient if the inadequacy is substantially injurious to creditors. *Jameson v. Dilley,* 27 Ind. App. 429, 433, 61 N. E. 602; *Fuller v. Griffith,* 91 Iowa, 632, 60 N. W. 247; *Gnichtel v. Jewell,* 59 N. J. Eq. 651, 41 Atl. 227; Bump, Fraud. Conv. (4th ed.) § 265; *Sandman v. Seaman,* 84 Hun, 337; *Snyder v. Partridge,* 138 Ill. 173, 32 Am. St. Rep. 130. "A debtor must be just before he is generous." *Faber v. Matz,* 86 Wis. 370, 375.

For the respondents *Day* there was a brief by *Butterfield & Rix,* attorneys, and *S. S. Barney,* of counsel, and oral argument by *Mr. Barney* and *H. K. Butterfield.*

*J. C. Russell,* for the respondent *Schwartz.*

Dodge, J. The principal controversy in this case is one of fact, namely, whether the conveyance from *Krenn* to *Frank Day* was received by him with intent to hinder, delay, or defraud creditors of *Henry Krenn,* or with knowledge of such intent on *Krenn's* part, and whether it was induced by fraud and duress upon *Krenn.* The narrative of the transaction occurring on the 12th day of August, presented by *Krenn* and several of his family, in which they all concurred with striking unanimity down to the most trivial details, was in direct antithesis to that presented by *Frank Day.* That narrative is in effect that *Krenn* at that time had no reason to apprehend imminence of criminal proceedings against him for the murder of Gehl, nor doubt of ability to prove innocence by the members of his family, although there had been

such suspicion in the community as to make his continued residence there unpleasant; that in the early morning of June 12th *Frank Day* came to *Krenn's* farm, and, with great manifestations of grief and protestations of friendship, told him that a warrant was about to be issued and within twenty-four hours he would be arrested with practical certainty of being sent to Waupun for life; that he could place no reliance on a defense resting on the testimony of members of his family; that Waupun contained more innocent than guilty, and his innocence would not avail him; that he must flee the country and go to Germany or, as well, to Canada, where he would be safe; also that *Day* urged, as the only means of accomplishing this result, that *Krenn* sell the farm to him and get the money to go away; that he offered to buy it at $14,000 and, on *Krenn's* protestation that that was not enough to pay his many outstanding debts and make any provision for his numerous children, *Day* insisted that such considerations should not weigh against the certainty of arrest and conviction which hung over him, and that he could disregard all but mortgage debts; that the family was thrown into great excitement and terror; that tears were shed copiously at all times, but finally *Krenn* and his wife were induced to consent, and *Day* went and got Mr. Rix, an attorney at Hartford, to draw the necessary papers; that the same excitement, weeping, and threat of arrest were persistent after Rix's arrival, and that Rix confirmed *Day's* statement that *Krenn* would be safe in Canada; that then was executed the deed in question, but for the consideration of $13,000 instead of $14,000, *Day* insisting that he would give but $13,000 and that *Krenn* could not possibly let the matter of $1,000 stand between him and escape from state prison. They also testified that at that time, and in the presence of Mr. Rix, *Krenn* reiterated the statements that this was not enough, in view of the numerous unsecured debts which *Krenn* owed. Further, that, as a part of the scheme, *Day* suggested a secret flight by defendant *Henry Krenn* and

his oldest son, who was included in the threat of prosecution, and insisted that they should go to a remote corner of the farm some two miles away and meet him after dark that night, to be taken to West Bend to catch train for Canada.

On the other hand, *Day's* narrative is to the effect that, upon his visiting the farm Monday morning for purpose of examining it more thoroughly to enable him to handle it as a real-estate agent under the option which had been given him on the 10th, he was met by *Krenn* with the statement that *Mrs. Krenn* and the girls had heard at church the day before that a warrant was to be issued that day for *Krenn's* arrest, and that he must flee the country. He urged *Day* to purchase the farm at once under the option. The latter, responding to *Krenn's* inquiry, stated that he had heard the same story about the issuing of warrant, but that nothing had been heard of it in Hartford and that he did not believe there was any foundation for it, since, if there were, it would probably be known there. He also objected strenuously to buying the property at all, stating he had no means to buy it with and did not want any farm; and, upon further solicitation, said that the only inducement upon which he could be brought to consider it would be a price so low that he was sure to be able to promptly sell it at a good profit, as he would have to borrow all the money and could not take the chances of having to carry it for any considerable time; that he could not think of paying for it the $15,000, for which he held an option for ninety days, during which time he had hoped to find a customer, but at last he offered to give $13,000 for it, whereupon, after protestation that it was too little, and acknowledgment by *Day* that it was not a full price for the property but all he could afford to give, *Krenn* accepted and arranged that $1,800 was to be paid at once to him and the rest to be paid to *Mrs. Krenn* as soon as an abstract could be prepared and delivered showing good title; that no suggestion was made by *Krenn* of the existence of any creditors other than those hold-

ing the mortgages, and that the existence of any such creditors never occurred to *Day's* mind and was wholly unknown to him. After those terms had been agreed upon *Day* proposed that they go to town and have the papers drawn up; but *Krenn* insisted that a scrivener be brought to the house. *Day* accordingly went and got Mr. Rix, who had theretofore been acting as attorney for the *Krenns* both in regard to the charges of complicity in the Gehl murder and in regard to other business.

At this point Mr. Rix takes up the narrative and tells of a course of conduct at the house entirely consistent with the story told by *Day,* and in entire contradiction of those differences related by the *Krenns.* He says there was no excitement, no tears, no urgency by *Day* or assertion of any peril, but that the question was put to him by *Krenn* and his wife whether he knew of the rumor which they had heard at church of the imminence of arrest, and that he assured *Krenn* that, in his best judgment, there was no foundation for it, and that he stood in no peril, and urged him above all not to think of leaving the country, as it would give strong support to the suspicions against him; also assured him that it would do no good, for he could be arrested in Canada as well as in Wisconsin, advising him, if he still persisted in moving away from the farm by reason of the unpleasantness, that he should not go to any considerable distance. He also contradicts the *Krenns'* statement that any reference was made in those interviews to the existence of debts other than those secured by the mortgages.

Thus was presented to the trial court two theories of the transaction out of which sprung *Day's* title, wholly inconsistent, and inconsistent in such a way that one or the other must be a fabrication as to the general color and character of the events. The story of one side convicted the other of wilful falsity. The choice between the two involved in a peculiar degree in this case that function of the trier of facts

which consists in judging of the personal character and credibility of the witnesses. It appears that the *Krenns* had already been through a litigation in the presence of the same judge, that Mr. Rix was a practicing attorney in close proximity to the judge's home, and, in addition to this, and of great weight under the circumstances, was the appearance and manner of the several witnesses, which cannot be made to appear in this court by the manuscript record. Could we know that all the witnesses were of equal credibility, we might find it hard to say that the testimony of the four or five members of the *Krenn* family did not constitute a volume of evidence preponderating over that of the one interested defendant, *Frank Day,* although he was confirmed, and they refuted, as to many essential elements by the attorney, Rix, who was at least free from pecuniary interest; but, under the rule so long recognized, it would be very dangerous for this court, upon inspection merely of the written testimony, to place its judgment in opposition to that of the circuit judge who presided through the trial and had superior knowledge of the character of the witnesses and saw the manner in which they gave their testimony.

In addition to this direct conflict of testimony there are numerous circumstances of conduct and the like of one or another of the parties which are in some degree consistent with one theory of the transaction and inconsistent with another. It, of course, is not the province of this court to attempt to summarize those; but, as an illustration, it may be pointed out that when, as is the fact, *Frank Day* learned on the afternoon of the 13th that one Jackson claimed to be a creditor of *Krenn's,* he immediately went with him to *Mrs. Krenn* with the expectancy of having her pay him out of the money which she was to receive. Such conduct would hardly be expected of a man who knew that the transaction had been entered into by *Krenn* with the purpose of evading payment of such debts. Again, the defendant *Day* co-operated with Rix in an effort

to induce *Krenn* to change his mind about leaving the country, and, although given money for the purpose of buying tickets to Canada, bought them only to Fond du Lac, and brought *Krenn* in contact again with Rix and with Rix's father, who seems to be an old acquaintance of *Krenn's,* both of whom again urged upon him the folly of fleeing the country, and tried to disabuse his mind of the existence of any peril from remaining. The court might, and doubtless did, consider that conduct on the part of *Krenn* which under some circumstances would strongly suggest fraud against creditors, both to the court and to a purchaser, was fully accounted for by another motive, namely, that of immediate flight to escape arrest, to which all witnesses testified. The haste, the secrecy, the assent to a low price, the dealing with the nearest buyer instead of seeking better price elsewhere, all fall in such category. Also was significant the payment of the bulk of the money consideration into the wife's hands, especially as it was to remain for a time at least within reach of neighborhood creditors and under circumstances such that she at least understood she was authorized or expected to pay honest debts with it, for she paid some $1,400 of such debts when presented; refusing to pay plaintiff because "they didn't owe him anything." Further, it should be noted that *Krenn* himself denied any intent to delay or defraud his creditors, but testified that fear of arrest was the sole motive of the sale, which, by the way, left him entirely solvent and supplied with much more than enough money to pay all unsecured debts after deducting the $1,500 which he carried away with him. Of course, when the trial judge concluded that the *Krenns* had deliberately testified to a false and fabricated story, they stood before the court self-impeached generally, and any of their statements might of themselves have been given little or no weight as against conflicting evidence.

Doubtless there are circumstances which could be urged as confirmatory of, or at least consistent with, the other theory;

of the transaction; but all of these were before the trial court, and his finding discloses that the various points of dispute and all the circumstances were most carefully considered by him.   We are persuaded, after examination and re-examination of the evidence, and after giving all due consideration to the very forcible and able argument made by appellant's counsel in this court, that we cannot justify ourselves in the conclusion that the finding of the trial court is so against that clear preponderance of evidence that we must conclude that he made a mistake of law or ignored the evidence upon one side.   These findings establishing, as they do, that there was no intent on the part of either *Krenn* or *Day* to hinder, delay, or defraud creditors of the former, the grounds upon which a conveyance can be held void, under sec. 2320, Stats. 1898, fail, and the conclusion follows that the plaintiff, being a mere general creditor until after the conveyance, has shown no interest in the property which he can invoke aid from the court to protect.

Counsel, to avert such result, seek to invoke the doctrine that so long as any portion of the price remains unpaid the purchaser, however *bona fide* in other respects, is not so with reference to the portion remaining unpaid at the time he receives notice of another's rights.   That doctrine may be conceded full force in its proper field, namely, where the plaintiff has a right, legal or equitable, in the property which upon the facts as they really exist is and ought to be superior to any interest which his vendor could convey to the defendant, but where a court of equity will defeat those rights in protection of one who has bought in good faith and for a valuable consideration.   There, since the whole purpose is merely protection to the purchaser, courts go no further than the point where he could have protected himself.   Examples of the principle are found in our recording statutes, under which are several of appellant's citations.   There the true title in favor of the first grantee is cut off in favor of the second grantee,

who, in reality, obtains no title by his conveyance. Again, if a conveyance is actually void because made with intent to defraud creditors so that neither the first nor any subsequent grantee obtains any title in fact valid against creditors, yet the latter may be denied enforcement of their rights against the land in favor of a *bona fide* purchaser for a valuable consideration; but under general equitable rules such denial will go no further than is necessary to protect him in his purchase, which can be accomplished by requiring that he pay them any portion of the consideration which he can control at the time he learns of their rights, unless some modification is accomplished by statute. Sec. 2324, Stats. 1898; Pomeroy, Eq. Jur. (3d ed.) § 735 *et seq.; Everts v. Agnes,* 4 Wis. 343; *Wynn v. Carter,* 20 Wis. 107, 111; *Hamlin v. Wright,* 23 Wis. 491; *Nix v. Wiswell,* 84 Wis. 334, 343, 54 N. W. 620. That doctrine, however, has no application to a valid sale, for there is no right in another, legal or equitable, in the property; there is nothing of which a purchaser can have notice to affect his good faith. The appellant's contention would require every purchaser of property who learned at any time before completed payment that the seller owed a debt, to refuse payment to the vendor on the chance that such creditor might elect to pursue the property sold instead of other assets of the debtor. Such doctrine would render sales on credit unsafe, and relegate the commercial world to cash transaction, if not, indeed, prevent sales altogether, by those known to owe any debts—an obvious absurdity. Only where there is intent, actual or constructive, of at least one of the parties to hinder, delay, or defraud creditors does sec. 2320, Stats. 1898, render the sale void. Since the findings negative any such intent, the sale was valid, and no after events could avoid it. If a general creditor would reach purchase money due on such a sale, he must impound it by garnishment or some similar legal process.

There remains for consideration appellant's further conten-

tion that, whenever property is sold for a price known by both vendor and vendee to be less than its true value, the difference between price and value will be deemed a voluntary gift, void as to creditors, and for which even an otherwise *bona fide* purchaser will be charged as trustee. Obviously this doctrine, carried to the extent of its statement, would be subversive of any considerable commercial activity and preclude a purchaser from availing himself of what he deemed a good bargain. Nevertheless, the rule is so stated in some text-books and in some decisions. 14 Am. & Eng. Ency. of Law (2d ed.) 299; *Withrow v. Warner,* 56 N. J. Eq. 795, 35 Atl. 1057, 40 Atl. 721; *Fuller v. Griffith,* 91 Iowa, 632, 60 N. W. 247; *Cox v. Collis,* 109 Iowa, 270, 80 N. W. 343; *Wiltse v. Flack,* 115 Iowa, 51, 87 N. W. 729; *Jameson v. Dilley,* 27 Ind. App. 429, 61 N. E. 601; *Worthington v. Bullitt,* 6 Md. 172, 198; *Norton v. Norton,* 5 Cush. 524; *Bailey v. Kennedy,* 2 Del. Ch. 12. On examination these cases fall into three classes: First, where actual donation is understood and intended, but something is paid either because the property is greater than the intended donation, as where a farm is given to one son in excess of his share and he pays a small portion of its value to equalize, or because the donor must have a certain sum of money which is measured purely by that necessity and not by reference to the value of the property transferred; second, where the purpose of both parties is merely payment of antecedent debt, and courts have held that, if payment be accomplished, all equities are satisfied—a doctrine antagonistic to many Wisconsin decisions; and, third, in one or two cases of original bargain and sale, in which, however, the fraudulent intent of the grantor has been apparent, though not fully proved to have been shared by the grantee. In those cases courts have, in somewhat high-handed manner, substituted a new bargain for the one actually made, with the excuse that no injury would be done the purchaser if he was protected in all the money he had paid, apparently forgetting

that under the genius of our system of law the fruits of a good
bargain honestly made are as much property as the considera-
tion money paid. This doctrine would seem repugnant to
sec. 2323, Stats. 1898, providing that mere absence of valu-
able consideration alone shall not avoid a conveyance.

It is, of course, in the third class, if any, that the present
transaction must fall; for, obviously, there was no purpose of
free gift between the parties. *Krenn* was seeking to obtain
all that he could get for his property in the market to which
his exigency of haste and secrecy confined him. Neither was
there any antecedent debt attempted to be paid. But there is
lacking here the element of a fraudulent purpose in the
grantor which was present in the only cited cases belonging
to this class, and which we deem essential to even an ap-
proximately sound basis for application of the doctrine con-
tended for. Then only can the validity of the sale be
inquired into at all, or the good faith of the purchaser be
material, for this class of cases must rest upon an extension
of the doctrine of good faith heretofore discussed.

But, apart from all other reasons, we deem it plain that
there was no such extreme discrepancy between price and
value as would render the doctrine applicable even according
to the authorities which support it. True, the court has
found that the property conveyed for $13,000 was reasonably
worth $16,200, an ostensible inadequacy of about one fifth—
far less than that which in any of the cases cited has been held
sufficient to arouse this supervisory power of the court. But
"reasonable worth" is an elastic term, especially as to farm
property. It ordinarily means what may be obtained by one
under no pressure or compulsion to sell until he can seek and
find a customer desiring to purchase. Market value varies
with the market. It is undisputed that, at a time when *Krenn*
was under no pressure of haste or secrecy, he was willing to
accept $15,000, free of commissions and expenses of sale, and
*Day* was willing to risk a certain amount of work, and noth-

ing else, in testing the existence of any one desirous of buying and the views of such a buyer as to value. On June 12th the parties were in no such market. No ninety days of search for a buyer could be indulged. Such search, even for a few hours, could not be extended among people generally, for thereby the apprehended arrest might be precipitated. *Day,* if he purchased, must raise a large sum of money, perhaps to the embarrassment of or loss in his other enterprises and transactions. He must tie that money up in property needing continual care and attention, and he must run the chances of the correctness of his judgment as to the salability and sale value of the property. Inadequacy is said to exist only where the price is palpably less than what the property could bring at public sale *in the market*—what the vendor would have taken from another. Bump, Fraud. Conv. § 265. We are not prepared to say that, in such situation as outlined, the price was inadequate, even though the "reasonable worth" of the property was as found by the court; certainly not in the degree to warrant a court in setting aside a bargain made by the parties honestly and with no fraudulent intent.

Several other propositions urged by appellant depend for their applicability upon fraudulent intent in one or both of the parties to the original conveyance, and our conclusion that the negation of any such intent must be sustained renders their discussion unnecessary.

Complaint is made of the taxation of a separate bill of costs in favor of each of the defendants *Day,* who appeared by the same attorneys, and, thereby, to duplication of items of "retainer" and "brief." In this we can find nothing of error. *James B. Day's* defense involved issues of fact and questions of law not included in that of *Frank Day.* It was necessary to his complete defense that he retain counsel, and that a brief be presented covering those issues and questions. Since the amount of his separate costs was to be ascertained and ultimately embodied in a judgment in his favor indi-

vidually, certainty required that they should be presented in a separate bill of costs; a general bill would have been uncertain and ambiguous as to which of the two defendants claimed recovery for those general services which could be taxed but once, such as attendance on trial, drawing findings and judgment, etc.

Further complaint is made of taxation against plaintiff of the whole 138 folios of findings covering the facts involved in both the issue of fraud against creditors in the conveyance from *Krenn* to *Day* and the issue of duress and fraud against *Krenn* in the same transaction. Beyond question, if any distinct portion of the findings could be said to have no reference to the issues joined on the complaint, no folioage should be taxed against the plaintiff therefor; but the difficulty is that all that was said and done in these transactions had legitimate bearing on those issues, although much of it was also relevant to the issue of duress. We find substantially none of the facts and circumstances passed on by the findings which are not urged by one party or the other as tending to support or refute the theory of an intent to defraud creditors on the part of either *Krenn* or *Day,* or of the latter's want of good faith. We are therefore unable to conclude that any separate portion of the findings is so disassociated from the issues tried between the parties to this appeal that we can overrule the trial court's exercise of discretion, which is plenary over costs in equitable actions within the limits fixed by the statutory cost bill.

*By the Court.*—Judgment affirmed.