[No. 22480.   Department Two.   October 6, 1930.]

PUGET SOUND NATIONAL BANK OF TACOMA, *Respondent,*
v. BESSIE D. MORE, *Appellant.*[1]

[1]Reported in 291 Pac. 1081.

*J. Charles Dennis,* for appellant.
*Kelly & MacMahon,* for respondent.

FULLERTON, J.—On January 8, 1928, the respondent, The Puget Sound National Bank, instituted the present action against the appellant, Bessie D. More, stating its cause of action as follows:

"II. That heretofore in that certain action instituted in this court wherein the plaintiff was the plaintiff and Glen E. More and E. E. Anderson and E. M. More and Mattie More, his wife, were defendants; the same being No. 60617, records and files of this court, the plaintiff recovering judgment against the said defendants.

"III. That thereafter plaintiff caused execution to issue upon the said judgment and the said execution was, by the sheriff of this county, duly levied upon the following described real property situated in Pierce county, Washington, to wit:

"Lots eleven (11) and twelve (12) in Block 528, 'Central Addition to Tacoma, W. T.,'
and the said real property was thereafter duly sold by the sheriff of Pierce county, Washington, to the plaintiff, which said sale was by the court duly confirmed. That prior thereto and in contemplation of the judgment to be rendered in the action hereinabove set forth the defendants therein, E. M. More and Mattie More, his wife, in order to defraud the plaintiff and to place their property beyond the reach of the plaintiff herein deeded the real property hereinabove described to their daughter, the defendant herein;

Bessie D. More; that such deed was issued without consideration and was and is void as to the plaintiff herein.

"V. That such deed constituted a cloud upon the title to the real property above described and in equity should be removed. That the said E. M. More and Mattie M. More, his wife, have no property other than the property conveyed as above set forth out of which the judgment of the plaintiff in the action above mentioned, could be satisfied."

The prayer of the complaint was for a decree quieting title in the respondent to the property described.

The appellant, in her answer to the complaint, admitted paragraph II thereof, and denied by a general denial paragraphs III and V. For an affirmative answer, she alleged that she purchased the property prior to the commencement of the action set out in the complaint, and is the owner thereof. In the prayer, she asked that her title to the property be quieted as against the judgment of the respondent. A trial was had on the issues as thus framed, resulting in a decree in favor of the respondent in accordance with the prayer of its complaint.

The evidence developed that the judgment under which the property in question was sold to the respondent was founded on a note due the respondent by a partnership composed of Glen E. More and E. E. Anderson, on which E. M. More and Mattie More were sureties. The indebtedness had existed for a considerable length of time, and there had been a number of notes given to represent the obligation, the last of which was dated January 5, 1925, and was for the sum of $10,915. Between its date and the time the respondent began its action thereon, the larger part of the note had been paid, principally by the surety E. M. More.

The complaint, it will be observed, does not state the amount for which the judgment was recovered, and the evidence, as it is transcribed in the record sent to this court, is equally barren. The only evidence bearing on the question is that of the president of the respondent. The note sued upon was not filed in the cause at the time the judgment was taken, but seems to have been retained by the respondent. Testifying from the note, the president said that there was due thereon at the time of the trial of the present action the sum of $3,254.18. In enumerating the payments made on the note, however, he did not include the sum bid for the property at its sale under the judgment entered on the note. Assuming that the witness meant the sum remaining due on the judgment, it would appear from his testimony that nothing was realized on the sale of the property over and above the costs expended in obtaining the judgment and making the sale; at least, nothing to apply on the original debt.

The evidence also disclosed that the partnership of More & Anderson was engaged in the business of highway construction; that, subsequent to the execution of the note mentioned, they became involved and were forced to discontinue their work; that they then had property on hand, consisting of a truck, traction engine, grader, rock crusher, dump cars, wheel scrapers, and the like, which cost them, according to their statement, twenty-six thousand seven hundred dollars, and which then had a value of fifteen thousand dollars. This property, at the time in question, they transferred to the respondent by bills of sale as security for the indebtedness they owed it, and as security for another preferred creditor whose claim seems to have amounted to five thousand dollars. This property the respondent assembled at a place in Seattle at a cost exceeding fourteen hundred dollars. A considerable

part of the debt due the other creditor mentioned was paid out of other securities the partnership had, the precise amount not appearing in the record. It further appears that the respondent had not disposed of any considerable part of the personal property transferred to it down to the trial of the present action, but was still holding it as security for the unpaid part of the note at the time of such trial.

■ The evidence thought to show that the sale of the property from E. M. More and Mattie More to the appellant was fraudulent consisted principally of their own testimony. The respondent put them on the witness stand and quizzed them concerning the transaction. Their testimony was to the effect that the appellant was the daughter of E. M. More and Mattie More; that she was a graduate nurse in the employ of the government, and had been so employed for a number of years; that, for a period covering a series of years preceding the date of the deed in question, she had, from time to time, sent sums of money to her father for investment, which he did invest, in part at least, in mortgages and perhaps other securities. Her father, when she began to make the advances, was in affluent circumstances. Later on he became involved, and possibly at the time of the execution of the deed he had nothing left of his considerable fortune but the property conveyed. At that time, he was owing the appellant, according to their testimony, upwards of three thousand dollars, and conveyed the property to her in satisfaction of the debt.

The evidence disclosed, also, that E. M. More, at the time he became surety on the note, owned three tracts of real property, the first the property here in question, the second a similar tract, and the third a farm. What disposition was made of the farm, the record does not show. The second tract was deeded to the

respondent, and it was subsequently sold by it, the sale netting five thousand dollars, which was credited on the note. It is the testimony of More that it was his understanding, when he made the deed, that he was to be relieved from further liability on the note; that the amount remaining due could, and would, be met by the securities the original debtors had transferred to the appellant.

The respondent argues that the story told by the appellant and her father is so remarkable and preposterous as to be unworthy of belief, but we can discern nothing unnatural or improbable in it. It is true that they kept no very accurate accounts of the amount of money advanced, and true that the daughter testifies that the father, at one time, returned to her seven hundred dollars, but the money was advanced at regular periods and usually in the same amounts, and from these circumstances, a reasonably accurate estimate could be made. Both testify that the amount fully equaled three thousand dollars, the sum which furnished the consideration for the conveyance of the property.

Nor did the trial court rest its conclusion on the contention here urged. The presiding judge filed a written opinion in the cause, in which he stated the grounds on which the judgment of the court was rested. These were that the grantor was insolvent at the time the conveyance was made; that the consideration for the transfer was inadequate, and was founded on a past consideration; that the transaction was between father and daughter and subject to close scrutiny for that reason; that no accurate account was kept of the advancements, and that they were not handled in the usual way; that the deed was withheld from the record until sometime after its execution; and that the father had made false statements concerning the purpose of

a mortgage which he had theretofore placed upon the property. And the judge, in his opinion, made these further comments, namely:

"Defendant contends that plaintiff should first apply the proceeds of the sale of machinery to payment of the judgment. The court thinks the law is that plaintiff may satisfy its judgment out of the property of any one of the judgment debtors. Defendant's brief concedes 'That she cannot contest that the bank has a judgment against More, on which it can levy on whatever property happens to belong to E. M. More.'

"Defendant further contends that More was discharged from any liability as indorser because the bank made an agreement to relieve part of its security. That defense was open to More, but he did not see fit to appear in the action and plead it. This defense is not open to defendant in this action."

It is at once manifest from these recitals that the court did not rest its judgment on the ground that the transactions between the father and the daughter were so remarkable and preposterous as to be unworthy of belief. The manner in which they transacted their business dealings with each other is undoubtedly a matter that may be taken into consideration along with the other evidence in the case to determine the good faith of the parties and the honesty of the transactions, but it is evidence merely, not conclusive of the question.

Looking to the reasons on which the court rested its conclusions, they do not appear to us to be controlling. The fact that the grantor was insolvent at the time the conveyance was made does not avoid the conveyance. This court has held, in a line of cases too numerous to require citation here, that a failing or insolvent debtor may lawfully prefer any one of his creditors to the exclusion of the remainder. Nor is the rule different where the preference is given to a

relative of the debtor. In such an instance, the court will perhaps give the transaction a closer scrutiny than it would were the preference given to a creditor not a relative, but in either instance the inquiry is the same, namely, was the transaction made in good faith?

The court's conclusion was that the consideration for the conveyances was grossly in excess of the consideration paid by the daughter for the property; that it was then worth upwards of eight thousand dollars. The evidence on this question is that the father, in statements made to the bank when the partnership was asking credit offering the father as security, valued the property at eight thousand dollars. But the father explains that, subsequent to the statement, the city of Tacoma enacted a zoning ordinance in which the property was placed in the business district of the city, that this ordinance destroyed its value as residence property, and that its value as business property did not exceed the consideration that the daughter paid for it. There was no other evidence of value, and we see nothing unreasonable in this explanation. But if we accept the court's finding as true, it only further emphasizes the utter inequity of the respondent's part of the transaction. The evidence of its president is, as has been shown, that the respondent acquired the property without reducing the indebtedness of its owners in any amount whatsoever. In other words, it acquired a property worth eight thousand dollars without any consideration moving to its owner.

The fact that the consideration for the property was a past consideration is of no consequence. In all instances where a debtor prefers a creditor, the same condition exists, and no court holds this to be a ground for avoiding the preference. Furthermore, the consideration for which the respondent sought to acquire the property was a past consideration, and

why the fact should be more meretricious in the one instance than in the other is not readily apparent. Nor is the fact that the deed was not recorded until some time after its execution, in our opinion, a badge of fraud when the circumstances are considered. It was delivered at the time it was executed, and was recorded prior to the time the respondent commenced the action in which the judgment was recovered under which the property was sold, and the respondent explains that she did not understand the necessity of recording instruments of that sort. It would seem, too, that the fact weighs as heavily in favor of the good faith of the transaction as it does against it. More commonly, where a fraudulent conveyance is made, the parties comply with, rather than neglect, the formalities which tend to give the transaction the appearance of regularity and good faith. But the weight that is to be given to such a transaction must always depend on the circumstances which surround it, and here we see nothing in the surrounding circumstances which requires that weight be given to the particular transaction.

The finding of the court that the father had made untruthful statements concerning the transaction between himself and his daughter is founded on this circumstance: Sometime prior to the execution of the conveyance, the father placed a mortgage on the property in favor of the daughter. The president of the respondent testified that, when he inquired of the father about the purpose of the mortgage, he answered that its purpose was "for protection." The trial court, in commenting on the circumstance, makes this inquiry: "If it was for money he owed his daughter, why did he not state the facts?" The father denies having any recollection of the conversations, and says that, if

such a conversation did occur, he did state the facts, and made no such statement as that imputed to him.

But if we follow the trial court and accept the president's statement as true, we see no reason in it for holding the transaction here in question void. The father is not a party to the present action, a fact seemingly lost sight of in the trial in the court below. His participation in the trial was as a witness only, and a witness called by the respondent itself. The evidence could be admissible only as tending to impeach him as a witness, and it may be doubted whether the respondent, after calling him as a witness, and thus vouching for his character for truth and veracity, could be permitted to impeach him afterwards. But be this as it may, impeaching evidence never tends to prove a fact. Its only purpose is to show the unreliability of the witness, and thus destroy the effect of his testimony as to purported facts to which he does testify, and this evidence, disputed as it is, we cannot think sufficient to have that effect. Other circumstances considered by the court as weighing against the good faith of the transaction, we have already sufficiently noticed.

It appears in the evidence that the father and mother have, at all times, remained in possession of the property since its conveyance to the daughter, and this is urged upon us as conclusive evidence that the conveyance was fraudulent. But the evidence disclosed that the father and mother are aged, that they have lost not only their fortune, but their earning power, and that, if they are turned out of this home and find another outside of the public charities, the daughter will have to provide it for them. It appeared also that, for a long time prior to the trial, and up to the time of the trial, the daughter had been making monthly contributions out of her earnings for their

support. Conceding that it was the purpose of the daughter in purchasing the property to provide a home for her parents, and that, in pursuance of that purpose, she suffered them to remain in it, we cannot think the circumstance was even evidence, much less conclusive evidence, that there was fraud in the transaction.

The further argument is made that the evidence relating to the consideration the respondent paid for the property at the sale under its execution, the fact that it has on hand property turned over to it by the principal debtor to be sold and the proceeds applied on the debt, and the further fact that the father had been led to believe, when he turned over a part of his own property to be applied on the obligation, that he was to be relieved from further liability thereon, have no bearing on the question here involved. It seems, also, from the quotation we have made from the trial judge's opinion, that he too was impressed with this view. But we think this overlooks the purpose of the evidence. The respondent came into court seeking equitable relief. Before it can have that relief, it must appear that it has a superior equity. The evidence complained of had a bearing on this question, and not only shows in our opinion that the respondent has no superior equity in the property, but very conclusively shows that it has no equity at all.

But we think the evidence fails to show any fraud in the transaction between the father and mother and the daughter, and we prefer to rest our conclusion on that ground.

The decree of the trial court is reversed, and the cause remanded with instructions to enter a decree in favor of the appellant in accordance with the effect of the prayer in her answer.

MITCHELL, C. J., HOLCOMB, and MAIN, JJ., concur.