251 P.2d 903

**NEAL et al. v. CLARK.**

No. 5590.

Supreme Court of Arizona.

Dec. 31, 1952.

Tom Fulbright, of Florence, Allan K. Perry and Elmer C. Coker, of Phoenix, for appellant H. E. Neal.

Warren McCarthy, Maricopa County Atty. and F. Haze Burch, Deputy County Atty. of Phoenix, for appellant Cal Boies.

Bob Barber and Franklin E. Vaughan, of Tucson, for appellee.

LA PRADE, Justice.

This is an appeal from a judgment of the Superior Court of Maricopa County, permanently enjoining its sheriff from proceeding with a sale, after a levy and execution, of certain lands held under State of Arizona grazing leases, the sale being had at the instance of the appellant Neal (defendant below), who was a judgment creditor of one John Rhodes, lessee under the state leases. The date of the sheriff's levy was February 5, 1951, and the sale under execution was noticed for March 20, 1951. In seeking to enjoin the sale appellee Tom Clark, plaintiff below, claimed that he was the owner of the leases, by purchase from Rhodes on September 21, 1950, and had gone into possession of the lands described and embraced therein under assignment of the leases to him by Rhodes and by his execution of assumptions filed in the office of the State Land Department on November 10, 1950.

Defendant Neal challenged the right of plaintiff to enjoin the sale and disputed defendant's ownership, claiming (1) that the purported assignment of the leases by Rhodes to Clark had not been consented to in writing, or at all, in compliance with provisions of Section 11–305, A.C.A.1939, and as a consequence Rhodes was still the owner of the leases and that the sheriff's sale should proceed. The material portion of Section 11–305, supra, as it relates to this case, is:

"* * * A lessee of state lands not in default in rent, and who has kept and performed all the conditions of his lease, may, only with the written consent of the commissioner, assign such lease."

and, (2) that the purported sale and assignments of the leases left Rhodes insolvent and was therefore fraudulent as to creditors, of which he was one at the time of the sale, and in violation of subsection 1 of Section 58–402, A.C.A.1939, which reads:

"* * * Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

Two issues are presented to the court for determination:

1. Was the assignment made by Rhodes to Clark contrary to the provisions of subsection 1 of Section 58–402, supra, and thereby void?

2. Was there a valid assignment from Rhodes to Clark of the State of Arizona leases under Section 11–305, supra?

Was the Conveyance Fraudulent?

Defendant claims that the conveyance by deed and assignments to Rhodes was fraudulent in that it rendered him insolvent and was made without a fair consideration. It was admitted that the conveyance and assignments left Rhodes insolvent. There was no claim and the record does not suggest any actual fraud on the part of either of the parties. As to whether a fair consideration was given was and is very much in dispute.

The leases, together with other holdings, were sold by Rhodes to Clark on September 21, 1950, for $48,000. The consideration was for cash, including the payment and discharge of three notes, secured by mortgages on the premises and leases, totalling approximately $40,000. The defendants claim that the ranch, deeded lands and leases were reasonably worth, at the time of the sale, between $90,000 and $100,000. Defendant's witnesses placed a value of $1500 to $2000 a section on the patented and state leased lands, and a value of $8000 on the Federal leased lands. Calculated at $1500 per section a total value of $76,250 would be the result. Plaintiff denied these values and testified that in giving $48,000 for the premises he had paid all the properties were worth.

The record discloses that prior to the difficulties leading up to this litigation Rhodes was the owner of the Sacaton cattle ranch, located in Pinal and Graham counties, Arizona. This ranch consisted of 55.18 sections containing 6.5 sections of patented lands, 39 sections of state leased lands, and 9.68 sections of Federal leased lands. Rhodes had theretofore executed two first mortgages on portions of the ranch, one to Roland Curry (1946) in the principal sum of $5500 and the other (1949) in the principal sum of $10,000 to a bank. Plaintiff's financial interest in

the ranch began on January 17, 1950, when he loaned Clark $22,500 secured by a second mortgage on the premises. Due to financial difficulties Rhodes was unable to meet his obligations on these various notes and mortgages. In April or May of 1950 Curry instituted suit on his note and to foreclose. As early as January, 1950, Rhodes had entered into negotiations with plaintiff Clark to purchase the ranch, which finally culminated in the sale on September 21, 1950, after Rhodes had made various attempts, without success, to sell the ranch to others. Rhodes testified that the highest offer he had received for the ranch, other than the offer of defendant Clark, was $40,000; that he had not been able to negotiate any bank loans with which to pay off these notes and mortgages; that he and relators, at his instance, had shown the ranch to several prospective purchasers including Roland Curry, holder of one of the first mortgages, but had not been able to interest any of them in a purchase; and being in this situation he finally sold the ranch to defendant Clark. By selling to Clark he received $8000 cash in addition to having his notes and mortgages discharged.

■ It has been said that the Uniform Fraudulent Conveyance Act is declaratory of the common law and practically a restatement of the statute of 13 Eliz., Osawa v. Onishi, 1949, 33 Wash.2d 546, 206 P.2d 498; Westminster Savings Bank v. Sauble, 183 Md. 628, 39 A.2d 862; with the exception that under the Act certain conveyances are declared to be fraudulent regardless of any actual intent to defraud. Collier on Bankruptcy, 14th Ed., vol. 4, p. 296. The Act provides that "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Sec. 58–402, supra.

■ By the terms of the Act, our Section 58–401, A.C.A.1939, states:

"* * * Fair consideration is given for property, or obligation: When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or when such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained."

This section of the Uniform Fraudulent Conveyance Act has often been construed. An examination of the cases from some of the jurisdictions where the Act is in effect indicate that an answer to the question of what is a fair consideration is not solely found by a determination of the thing sold and the price received in precise scales,

"* * * but all circumstances considered, there should be a reasonable and fair proportion between the one and the other". 24 Am.Jur., Fraudulent Conveyance, § 22, pp. 179, 180; Bianco v. Lay, 1943, 313 Mass. 444, 453, 48 N.E.2d 36; Osawa v. Onishi, supra. It has also been said that inadequacy of price does not mean an honest difference of opinion as to price, but a consideration so far short of the real value of the property as to startle a correct mind; Pope v. Brandon, 2 Stew., Ala., 401, 20 Am.Dec. 49; McGhee v. Wells, 57 S.C. 280, 35 S.E. 529, 76 Am.St. Rep. 567; or shock the moral sense, Clarke v. Philomath College, 99 Or. 366, 193 P. 470, 195 P. 822. Nor is it necessary that the consideration for the transfer was a just equivalent of the thing bought, Myers v. Fultz, 124 Iowa 437, 100 N.W. 351, or of equal values, Dygert v. Remerschnider, 1865, 32 N.Y. 629, 642. What is a fair consideration must, of course, be determined upon the facts and circumstances of each particular case. Halsey v. Winant, 258 N.Y. 512, 180 N.E. 253. By the application of these rules to our fact situation we must conclude, as did the trial court, that the consideration given was fair. There were no willing purchasers to be found. The reasonable inference is that Clark was not an anxious buyer. After loaning his money he was involved and had to protect himself the best way he could. Two alternatives presented themselves; he either had to buy the first two mortgages to protect his second mortgage, then foreclose all three mortgages, or he had to obtain a deed from Rhodes after acquiring the two first mortgages. Rhodes, not being disposed to harass Clark, and being desirous of obtaining as much cash as possible, determined to sell and deed to Clark. Had he not adopted this procedure he would not have received anything out of the ranch unless the properties on the foreclosure sales brought more than the mortgage debts, interest, costs and attorney's fees.

It is inferable from the judgment that the trial court was not impressed with estimates of value placed on the ranch by defendant's witnesses, though he observed that plaintiff apparently got a bargain. It seems to be that the bragains always go to those with money. In any event the fruits of a bargain honestly made are as much property as the consideration money paid, Rosenheimer v. Krenn, 126 Wis. 617, 106 N.W. 20, 5 L.R.A.,N.S., 395, and in and of themselves are not indicia of fraud.

Was There a Valid Assignment from Rhodes to Clark of the State of Arizona Leases Under Section 11–305, Supra?

This section provides that a lessee of state lands "may, only with the *written consent* of the commissioner, assign such lease." It was admitted that no "formal" consent in writing was ever executed by the Commissioner in a separate document

or by way of specific endorsements on the leases. It is claimed that this formality was excused by facts and circumstances attending the attempted assignments and the conduct of the Commissioner evidenced in writing. A brief resumé of the evidence adduced on this issue is necessary for a fair consideration and determination of the contentions presented.

On September 21, 1950 Rhodes' state leases were evidenced by some 43 separate documents (leases). On this date he executed applications to assign these leases to Clark, and Clark on the same day executed his applications for transfer and assumption of the leases. These documents (original leases) were filed in the office of the State Land Commissioner on November 8, 1950, at which time the transfer fees were paid. At the time these leases were deposited with the Land Commissioner by Messrs. Clark and Rhodes and Mr. Bob Barber, their attorney, they were informed by employees of the Land Commission that in view of the new land code, chap. 58, Laws 1950, the old leases would have to be renewed in Mr. Rhodes' name and then assigned to Mr. Clark. Mr. Rhodes was then permitted to sign 42 or 43 new leases in blank, at which time he executed assignments therefor to Clark. These executed blank leases were left in the Land Commission office, though not produced at the trial for the reason that they could not be located. At this time they were also informed there was nothing left to be done except the payment of the grazing fees, to be later calculated according to the provisions of the new law, and for which a blank check was received in payment.

It must be kept in mind that the date of the levy was February 5, 1951. On January 17, 1951, plaintiff's attorney advised the Deputy Land Commissioner, a Mr. James R. Burger, by letter that the Rhodes assignments had been deposited with the Land Commission the previous November; that it had been promised that the new leases would be seasonably executed; and inquired as to what was being done about it. In response to this inquiry Mr. Burger, on January 27th, advised:

"These leases are now in the process of billing and the amended lease and billing will be completed in a few days, possibly about the end of the next week."

On March 1, 1951, Mr. Barber addressed a second letter to Mr. Burger again making inquiry as to what progress was being made by the Land Commission office with reference to the new leases. On March 2, 1951, Mr. Burger by letter advised Mr. Barber that the new leases had been issued in the name of Mr. Rhodes; that they were in line to be transferred to Mr. Clark "when a determination was made concerning the writ of execution and notice of sheriff's sale" (defendant Neal's levy and execution) and "accordingly, other than billing the rental on the lands up to date,

the department plans to take no action with respect to the assignments to Mr. Clark until conclusion of the sheriff's sale".

The purport of the letter of the Deputy Land Commissioner under date of January 27th is to advise that the new leases are being drawn and that the "billing" (amount of rents due under the new Act) would be accomplished in a few days. The fair assumption is that the assignments had been approved. This is evidenced by the reasons given in later letters for the failure to deliver the new leases. The Deputy Commissioner testified that the new leases and assignments were not completed during the period November 8th to the time of the levy, February 5, due to the stress of work occasioned by the new law and the necessity of making out so many new leases. There was no suggestion that there was any disapproval contemplated. As of September 21, 1950, the deal between Rhodes and Clark was consummated. At this time they had honestly and fairly negotiated a sale and purchase of all the holdings of Rhodes. The fact that the paper transactions had not been completed in the office of the State Land Commission was not occasioned by any fault or neglect of theirs. Had it not been for the levy these paper transactions would have been completed.

In truth and in fact, as of September 21, 1950, Clark was the legal and equitable owner of the leases. In equity and good conscience Clark was entitled to have the new leases executed to him after he received the letter of the Deputy Land Commissioner under date of January 27th, advising that the new leases would be executed in a few days. The equitable maxim that "equity regards as done that which ought to be done" is clearly applicable as between all the parties hereto. In view of all the circumstances and the avowed intention of the Commissioner, through his Deputy, to consent to the assignments, there being no asserted reason why he should not, it became his duty to do so. Where an obligation rests upon a person (officer) to perform an act, equity will treat the person in whose favor the act should be performed as clothed with the same interest and entitled to the same rights as if the act were actually performed. Goodell v. Monroe, 87 N.J.Eq. 328, 100 A. 238, 240.

Equity regarding the written consent of the Commissioner to the assignments as having been given as of January 27, 1951, the legal and equitable title to the leases was vested in Clark. Rhodes had no property in the leases to be reached by the attempted levy. Our holding in the case of Jamison v. Franklin Life Ins. Co., 60 Ariz.

308, 136 P.2d 265, under a not too dissimilar fact situation, we believe to be applicable and our present holding in conformity therewith. In that case we held that the title to state land leases was in the assignee where assignments had been executed and the leases pledged with an option that they should go to the assignee upon contingencies. The contingencies having devolved the assignee was held to be the owner of the leases regardless of the fact that the Land Commissioner had not consented to the assignment of the leases. The affidavit of the Land Commissioner filed in the case was to the effect that he would have approved the assignments of the leases except for the pendency of the action. The only difference between that and this case is that in the former case the Commissioner was a party thereto. To this fact under the circumstances here we attach no importance.

We therefore conclude under the facts and the law applicable thereto that:

1. The sale and assignment of the leases were not fraudulent, and

2. That in equity the written assent to the assignments was given by the State Land Commissioner.

Accordingly the judgment is affirmed.

UDALL, C. J., and STANFORD, PHELPS and DE CONCINI, JJ., concur.