Bernard **BLUMENSTEIN**, Appellant,

v.

**PHILLIPS INSURANCE CENTER, INC.,**
and Martin Dredging, Inc.,
Appellees.

No. 1253.

Supreme Court of Alaska.

Nov. 30, 1971.

Richard F. Lytle, of Houston & Lytle, Anchorage, for appellant.

Floyd V. Smith, of Savage & Curran, Anchorage, for appellees.

## OPINION

Before BONEY, C. J., and DIMOND, RABINOWITZ, and CONNOR, JJ.

CONNOR, Justice.

Appellant sold a small vessel to a corporation under a conditional sale contract in 1966. During the next year appellant obtained a reconveyance of the vessel to himself. Shortly thereafter appellee Phillips Insurance Center, Inc., hereafter called Phillips, attached the vessel to satisfy a debt owing by the corporation to appellee Phillips. The superior court held that the reconveyance of the vessel to appellant was in fraud of creditors and that the attachment by appellee Phillips should take precedence over the interest of appellant. Appellant asserts that the trial court erred in finding that the reconveyance amounted to a fraud against creditors.

The background of this case is connected with a recurrence of gold fever which for a short time struck the community of Nome, Alaska. In the mid-1960's a venture was launched to recover gold from submerged deposits in the ocean offshore from the town. Lucrative dreams of a bygone era were revived briefly by the prospect of recovering this wealth through new dredging technology. But in 1967 the vision faded into the chill reality of economic failure. On the beach at Nome a converted landing craft, the MERMAID I, stands vigil as a tangible but lonely witness to the vanished hopes of a modern day gold stampede. However, it is only with the fate of the MERMAID I as a means of satisfying indebtedness that this appeal is concerned.

On May 14, 1966, appellant, Bernard Blumenstein, conveyed the landing craft MERMAID I to Martin Dredging, Inc. The transaction entered into between Blumenstein and Martin Dredging was labeled a "Conditional Sale Agreement". Although it was apparently intended to leave Blumen-

stein with a security interest in the MER-MAID I, the agreement was never recorded.

The conditional sale agreement called for an initial down payment by Martin Dredging to Blumenstein of 4000 shares of its stock. At that time the stock was selling for about a dollar a share. A balance of $11,000 was to be paid in installments. Two installments of $1,250 each were due in the summer of 1966. Further payment was then to be deferred until July 15 of the following year, at which time installments were to resume at a monthly rate of $2,500 until the balance had been paid. The terms of the sale also provided for alteration of the boat by Martin Dredging to suit its purposes. Martin Dredging was at the time embarking on the project to mine underwater gold deposits in the offshore area near Nome, and wanted the MERMAID I for test dredging to prove the theory that gold could profitably be retrieved from the underwater deposits. The vessel was converted as planned and was used during the summer of 1966 for mining operations, which initially proved to be successful. With the onset of winter, the MERMAID I was beached near Nome; the boat has not been used since that time, and it remains, to this date, at the location where it was left in the fall of 1966.

In the spring of 1967 Martin Dredging drastically increased the scope of its undertaking by purchasing and outfitting a surplus minesweeper, subsequently named the MERMAID II. Appellee Phillips was called upon to provide insurance for the MERMAID II. After summoning an underwriter to examine Martin Dredging's operation, Phillips contracted to provide insurance to the company.

The operation of the MERMAID II during the summer months of 1967 proved to be the undoing of Martin Dredging. Through a combination of unfortunate circumstances, the mining operation met with little success, while Martin Dredging incurred inordinately heavy expenses. By late summer it was generally known that the MERMAID II had proved to be a colossal failure. By that time Martin Dredging had been rendered insolvent, with no substantial assets besides the MERMAIDS I and II, and no funds with which it could pay outstanding obligations.

The financial collapse of Martin Dredging and the failure of the MERMAID II precipitated the events which culminated in this appeal. On July 15, 1967, the day upon which Martin Dredging was to resume monthly installments for the MERMAID I, Blumenstein failed to receive payment; he contacted the company and was assured that the money would be forthcoming within 30 days. However, by August 15, the date set for the second monthly payment of 1967, it became apparent that he would receive neither the delinquent July payment nor the August payment.

Blumenstein made several formal requests for payment at this time and contacted individual members of Martin Dredging's board of directors persistently. Finally, through the efforts of his attorney, Blumenstein persuaded the members of the board to call a special meeting concerning payment of the amounts due on the MERMAID I. In the course of this meeting, which was held on September 17, 1967, Blumenstein apparently proposed that Martin Dredging quitclaim its interest in the MERMAID I to him, in return for which Blumenstein would relinquish any claim for payment which he might have against the company. The members of the board ultimately acquiesced to this arrangement, and the MERMAID I was thus quitclaimed back to Blumenstein.

Testimony adduced below shows that shortly after this reconveyance of the MERMAID I, Blumenstein boarded the vessel and removed several items. A few days later he returned with a workman and spent several hours removing some more equipment and preparing the boat for the onset of winter. Some welding equipment which belonged to the boat was also retrieved from the Martin Dredging shop. Blumenstein took no further measures in

reasserting his possession of the MER-MAID I.

During this same period of time, Phillips ran into trouble collecting premiums on the insurance which it had procured for the operations of the MERMAID II. On August 19, 1967, Phillips sent Martin Dredging a notice of cancellation, giving the MER-MAID II 30 days to repair to a safe port. Nome was not considered a safe port, and at some time around the end of August the MERMAID II was taken to Seward, where she was later sold to satisfy a judgment for unpaid seamen's wages. In the first week of September 1967 Phillips filed suit against Martin Dredging to recover $7,931.25 in unpaid premiums. On September 15, about a week after Martin Dredging had quitclaimed the MERMAID I to Blumenstein, Phillips attached the boat.[1]

At first Blumenstein did nothing about the attachment papers affixed to the MER-MAID I. Not until it became evident that Phillips might actually sell the boat did he act. Accordingly, on September 3, 1968, almost a full year after issuance of the quitclaim deed by Martin Dredging, Blumenstein first filed a complaint in intervention against Phillips, alleging that the MERMAID I was his by virtue of the quitclaim deed. Phillips answered, denying the validity of the quitclaim transaction and affirmatively asserting that the conveyance to Blumenstein amounted to an attempt to defraud creditors.

On December 22, 1969, Blumenstein's claim came on for trial in the superior court at Anchorage, and on January 15, 1970, the court entered findings of fact and conclusions of law in favor of Phillips. Specifically, the court found that Blumenstein either knew or should have known of Martin Dredging's insolvency at the time he procured the quitclaim deed,

"and that the transfer amounted to a preference of the creditor Blumenstein over the Plaintiff creditor of Martin Dredging Incorporated." The court further held that Blumenstein's conduct was not sufficient to reassert possession of the MERMAID I in a manner which would give public notice of his interest in the boat, and that the quit claim transaction consequently fell within the presumption of fraud created by AS 09.25.060.[2] It was the court's conclusion that Blumenstein had failed to overcome the statutory presumption.

On appeal, Blumenstein asserts that the trial court erred in deciding that he had failed to properly retake possession of the MERMAID I. It is thus argued that the statutory presumption of fraud should not have been held applicable in the circumstances of this case, and that the quitclaim deed from Martin Dredging to Blumenstein constituted a valid conveyance of the vessel. Phillips rebuts Blumenstein's arguments on appeal, maintaining that the trial court correctly invalidated as fraudulent the conveyance in question. Phillips points out that the essential concern in determining whether possession over an object has been established should be whether the conduct of the party claiming possession would have sufficiently given notice to the general public of the party's interest in the property possessed. It is urged that Blumenstein's actions in the present case were insufficient under this criterion. Phillips additionally points to various badges of fraud in the transaction between Blumenstein and Martin Dredging, which, it is claimed, support the conclusion that this conveyance was made with intent to defraud creditors.

Although the primary focus of the controversy on appeal has been upon the adequacy of the possession which Blumen-

---

1. Judgment by default was entered against Martin Dredging and in favor of Phillips on October 27, 1967. At no time has Martin Dredging taken an active part in this litigation.

2. AS 09.25.060 provides in relevant part: "Every sale or assignment of personal property unless accompanied by the immediate delivery and the actual and continued change of possession of the thing sold or assigned is presumed prima facie to be a fraud against the creditors of the vendor or assignor * * *."

stein established over the MERMAID I, we have concluded that the trial court's decision would require reversal regardless of the proper disposition of this issue. Thus, in our consideration of this matter, we may assume that the trial court was correct in finding that Blumenstein's conduct was insufficient as a retaking of possession of the MERMAID I. We will further assume that the trial court properly held that Blumenstein was aware of Martin Dredging's impending insolvency.

■ Given these assumptions, it is apparent that Blumenstein, under the conditional sale agreement, did not perfect a security interest in the MERMAID I which would give him priority over Phillips' attachment lien.[3] He did not file either the conditional sale agreement or a financing statement prior to Phillips' attachment, so no perfection of security could come about through that means.[4] Blumenstein cannot avail himself of the alternative method of perfecting his security interest

under the Uniform Commercial Code. Because we accept the trial court's finding, it is apparent that Blumenstein did not perfect a security interest by taking possession of the vessel before the attachment by Phillips.[5]

■ Though Blumenstein could not prevail on the basis of his intended security interest, he also has a claim as a grantee for valuable consideration. We turn next to the question whether the quitclaim deed delivered to Blumenstein by Martin Dredging should properly have been invalidated under Alaska's law governing fraudulent conveyances.[6] AS 34.40.010 provides that a conveyance of goods made with intent to hinder, delay or defraud creditors is invalid. This statute provides Alaska's basic prohibition against transactions in fraud of creditors. AS 34.40.090 complements the basic prohibition by providing that the existence of fraudulent intent is a question of fact. Thus, under normal circumstances, fraud will not be presumed.

---

3. As our recent decision in Prince v. LeVan, 486 P.2d 959 (Alaska 1971), indicates, we must determine whether the validity of a given transaction is governed by the provisions of the Uniform Commercial Code before considering the applicability of general contract law.

4. AS 45.05.692 provides, in pertinent portion:
 "(a) Except as otherwise provided in * * * this chapter * * * [the secured transaction provisions] of this chapter apply * * *
 (1) to a transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts, or contract rights; * * *."
 The conditional sale agreement in question was plainly intended to create a security interest in Blumenstein. Moreover, the transaction does not appear to fall within any of the exceptions provided for in AS 45.05.696. Thus, the provisions of AS 45.05.734, which would require filing to perfect the conditional sale agreement, are applicable in the present case. See also, AS 45.05.732 and AS 45.05.690–45.05.794.

5. AS 45.05.740, which provides that a security interest in goods may be perfected by the secured party's taking possession of the collateral, applies in this case. Thus, if Blumenstein took possession of the MERMAID I prior to the boat's attachment by Phillips, he would have had a perfected security interest superior to Phillips' subsequent attachment. See AS 45.05.732(a) (2) and (c).

6. Given our conclusion that no security interest in the MERMAID I was perfected by Blumenstein, and assuming that Blumenstein did not adequately retake possession of the MERMAID I following reconveyance to him by Martin Dredging, it is evident that the provisions of the Uniform Commercial Code do not govern this transaction. Except in cases involving retention by a merchant seller in the course of trade, the code specifically leaves the validity of sales where the seller retains possession of goods sold to determination under existing state laws. See AS 45.05.128(b) ; 2 R. Anderson, Uniform Commercial Code § 2–402:5 (2d ed. 1971) ; Note, The Uniform Commercial Code and an Insolvent Seller's Possession of Goods Sold, 104 U.Pa.L.Rev. 91, 97–98 (1955).

Schreyer v. Scott, 134 U.S. 405, 10 S.Ct. 579, 33 L.Ed. 955, (1890); Matheson v. Patenaude, 8 Alaska 238 (D.Alaska 1930).

■ However, AS 09.25.060 qualifies the provisions of AS 34.40.010 and AS 34.40.-090, by erecting a prima facie presumption of fraud in cases where a sale of personal property is not "accompanied by the immediate delivery and the actual and continued change of possession" by the vendee. Since we have accepted as valid the finding that Blumenstein did not sufficiently retake possession of the MERMAID I after receiving the quitclaim deed from Martin Dredging, the conclusion seems inescapable that the statutory presumption of fraud created by AS 09.25.060 was correctly held to apply to the circumstances of the present case by the trial court. Yet by no means does it follow that the result reached by the lower court was correct.

■■ We must emphasize initially that AS 09.25.060 establishes only a prima facie presumption. This presumption is rebuttable. It serves merely to shift to the vendee the burden of proving that a conveyance was made without fraudulent intent. Meredith v. Thompson, 4 Alaska 360, 365–366 (D.Alaska 1911). Under AS 09.25.060, if a vendee has failed to establish immediate and continued possession over personalty which he has purchased, and if he makes no effort to show that the transaction was entered into in good faith, then a finding of fraud will be compelled. Where, on the other hand, the grantee introduces evidence tending to show that the conveyance in question was transacted in good faith, then the presumption will be dispelled, and it will be incumbent upon the finder of fact to determine whether there was actually an intent to defraud creditors.

In ruling upon the circumstances of the present case, the trial court stopped short of reaching the issue of actual intent to defraud. Instead, its decision was confined to the finding that Blumenstein had failed to overcome the presumption erected by AS 09.25.060. In our view, the court's exclusive reliance on the AS 09.25.060 presumption was unwarranted. Ample and convincing evidence was introduced by Blumenstein to show that the conveyance of the MERMAID I by Martin Dredging was undertaken in good faith.

■ It is significant that Blumenstein furnished a plausible, and, indeed, entirely believable explanation for his failure to take more positive steps in establishing possession of the MERMAID I after receiving the quitclaim deed from Martin Dredging. At the time of the conveyance, the MERMAID I had been beached for approximately one year. The boat was beached at the same location where it had usually been kept by Blumenstein prior to its conveyance to Martin Dredging. With winter impending, refloating of the boat would have been difficult and impracticable. It should further be noted that many indicia of ownership—such as the ship's Coast Guard number and its radio license—which might normally be expected to change with transfer of a boat, had remained unaltered since Blumenstein's original possession. Moreover, it must be considered that, while Blumenstein might not have actively and openly asserted his repossession of the boat, neither can it be said that the MERMAID I was, in any practical sense, retained by Martin Dredging. All of these factors, taken together, tend to explain Blumenstein's failure to retake possession of the MERMAID I, and thereby substantially weaken any inference of fraud which might be drawn.[7]

7. It is relevant to note that even in jurisdictions where legislation provides that failure of a vendee to take possession of purchased goods must conclusively be presumed to be fraudulent, the nature of the purchased goods and the circumstances surrounding the failure to take immediate possession may warrant exceptions to the rule. For example, in California it has been held that "[w]here a movable is bulky and not readily transferable by manual delivery the rule of that section [section conclusively presuming fraud] is relaxed by reason of the impracticability

 Even more significant than the facts surrounding Blumenstein's failure to take possession of the MERMAID I is the showing that the quitclaim deed to the MERMAID I was given in consideration for the discharge of a valid debt owed by Martin Dredging to Blumenstein.[8] The validity of Martin Dredging's obligation to Blumenstein under the terms of the original conditional sale agreement is not contested, and, in fact, seems to be assumed in the findings of the trial court. Similarly uncontested is the fact that Blumenstein discharged the debt owed to him by Martin Dredging in return for the quitclaim deed to the MERMAID I. It has previously been held that such a showing tends strongly, if not conclusively, to overcome the type of presumption created by AS 09.25.-060. For example, in Scruggs v. Blackshear Manufacturing Company, 45 Ga.App. 855, 166 S.E. 249, 251 (1932), under circumstances not unlike those of the present case, the court reversed a finding of fraud by the lower court, holding that while retention of possession by a vendor gives rise to a prima facie presumption of fraud, "[p]roof of payment of valuable consideration for the property rebuts the presumption * * *."[9]

 Because Blumenstein offered a satisfactory explanation for his failure to take more overt steps in attempting to reestablish possession of the MERMAID I, and because he further showed that the quitclaim deed delivered by Martin Dredging was issued in exchange for valuable consideration, we think that the trial court was unjustified in relying on the statutory presumption to invalidate as fraudulent the conveyance in question. Under these circumstances, the trial court should have considered the validity of the transaction as a question of fact pursuant to AS 34.40.010

---

of actual delivery by ordinary means and methods." Shepherd v. Gamble, 95 Cal.App.2d 890, 214 P.2d 403, 405 (1950).

8. Phillips has argued that the consideration paid by Blumenstein for the quitclaim of the boat was inadequate. At the time of the conveyance, a balance of approximately $8,500 remained to be paid on the original conditional sale agreement; Phillips contends that this amount was insufficient consideration for a vessel which had originally been sold for $15,-000, and subsequently re-equipped with costly machinery. However, it must be remembered that Martin Dredging, at the time of the quitclaim transaction, was insolvent and had no funds available to meet its current obligations. The company was already two installments in arrears, and apparently Blumenstein was making persistent demands for payment. Moreover, under the terms of the conditional sale agreement, if Martin Dredging had insisted on removing, prior to returning the boat to Blumenstein, the equipment which it had installed, then it would have been obligated to restore the vessel to the condition in which it had been at the time of the purchase in 1966.

The adequacy of consideration in any given instance cannot be viewed apart from the particular circumstances in which the parties find themselves. Schanno v. Pangle, 19 Wash.2d 539, 143 P.2d 540, 542 (1943). Any sale conducted under the pressure of economic necessity is bound to produce less than an optimal consideration; however, this fact will not affect the adequacy of consideration. Bank of Chelsea v. Elam, 167 Okl. 650, 30 P.2d 919, 920 (1934). Thus, for the purpose of determining whether fraud is indicated in a transaction, adequacy of consideration is usually judged by broad standards. As the court held in White v. Nollmeyer, 151 Mont. 387, 443 P.2d 873, 883 (1968), in order to determine whether a fair consideration had been paid,

"the test to be applied is whether the disparity between the true value * * and the price paid is so great as to shock the conscience and strike the understanding at once with the conviction that such transfer never could have been made in good faith."

See also Neal v. Clark, 75 Ariz. 91, 251 P.2d 903, 906 (1952). Applying this standard, we are unable to conclude in the present situation that the consideration paid by Blumenstein for the return of the MERMAID I was inadequate.

9. See also Andrews v. Lorraine Dance Studios, Inc., 189 A.2d 802, 804–805 (R.I.1963), where the court states that "a showing that there was adequate consideration for the sale of property retained by a vendor tends to rebut the presumption of fraud that arises from its retention."

and AS 34.40.090. Accordingly, the court should have ruled on the issue whether, in the conveyance of the MERMAID I to Blumenstein, there was an actual, as opposed to a presumed intent to hinder, delay or defraud creditors.

Under normal circumstances a remand to the superior court might be appropriate in order to allow the lower court the opportunity to rule upon the question of actual fraudulent intent. However, in the present case we feel that the necessity for a remand is obviated, since, in our view, the findings of fact rendered below preclude a conclusion of fraud.

In its fourth finding of fact, the trial court ruled that Blumenstein

"reasonably knew or should have known the corporation [Martin Dredging] was insolvent and that the transfer amounted to a preference of the creditor Blumenstein over the Plaintiff creditor of Martin Dredging Incorporated."

Both the tenor of the court's language and the context within which it is placed leave an indelible impression that the court believed that a preferential payment to one of several creditors by an insolvent debtor is in itself an unlawful or fraudulent act. Indeed, this appears to be a notion shared by the parties on appeal.

Yet the rule is settled that in the absence of bankruptcy laws or express statutory prohibition, an insolvent debtor may convey property to one creditor, even if it means that the debtor's assets will thereby be depleted, and that the claims of other creditors will be defeated. Under the common law,

"a transfer by an insolvent debtor to pay or to secure an antecedent debt has never been treated as a transfer to

hinder, delay or defraud creditors, although it is self-evident that other creditors are necessarily hindered and delayed by such a transfer." Irving Trust Company v. Kaminsky, 19 F.Supp. 816, 818 (S.D.N.Y.1937).

As Corbin states in his treatise on contracts:

"At common law it was not illegal for a debtor to pay one of his creditors in full even though he did not have enough left to pay his other creditors in full or even in part. Such a payment was not, and is not now, a fraudulent conveyance. The payment is merely the performance of an existing legal duty. Nor is it illegal for the debtor to transfer property as security for an existing debt; the value of the property in excess of the debt remains available to other creditors. The conveyance of property to a creditor in satisfaction of an existing debt is a fraudulent conveyance only in case its value is in excess of the debt and the purpose of the debtor is to keep that excess out of the hands of his other creditors." [10]

The rational underpinning of the rule which allows preferential transfers is not difficult to perceive, and has been aptly stated by the court in Irving Trust Company v. Kaminsky, 19 F.Supp. 816, 818 (S.D.N.Y.1937):

"[T]he rule against fraudulent conveyances may be availed of by a single creditor. To allow such a creditor, acting in his own interest alone, to set aside a preferential transfer as one in fraud of creditors would amount to substituting that creditor as the person preferred in place of the creditor chosen by the debtor." [11]

10. 6A A. Corbin, Contracts § 1467, at 566 (1962) (footnote omitted.) 1 G. Glenn, Fraudulent Conveyances and Preferences §§ 289 & 289a (rev. ed. 1940), is in accord with Corbin:
"If there is in our law one point which is more ungrudgingly accepted than others, it is that the preferential trans-

fer does not constitute a fraudulent conveyance." Id. § 289, at 488.

11. See also 1 G. Glenn, Fraudulent Conveyances and Preferences § 289 (rev. ed. 1940). Other courts support the rule allowing bona fide preferences by arguing that, prior to final judgment and execu-

Thus, numerous courts hold that a bona fide preference of one creditor over others will be upheld even where the debtor is or will be rendered insolvent, or where other creditors are threatening suit, or where the preferred creditor is aware of the debtor's insolvency.[12] Some courts have held that even if the debtor's intent is fraudulent, and even if the preferred creditor is aware of that intent, a preferential transaction will not be set aside so long as the preferred creditor, by accepting the conveyance from the debtor, is only protecting his own interests as a creditor.[13] Accordingly, it is the rule that a bona fide preference by an insolvent debtor does not, in itself, constitute evidence of fraud.[14]

In the present case, we take the trial court's findings of fact at their face value. The court found that the transfer of the MERMAID I to Blumenstein by Martin Dredging "amounted to a preference of the creditor Blumenstein over the Plaintiff creditor of Martin Dredging Incorporated." We think that the court's characterization of the quitclaim transaction as a preference of one creditor over another must be deemed conclusive. As we have endeavored to explain above, barring the applicability of bankruptcy laws or similar statutory provisions insuring equal distribution of an insolvent debtor's assets among all general creditors, there is nothing improper or unlawful about a preference being given to one creditor, even if it means that other creditors will be precluded from recovery. Here, both Blumenstein and Phillips were found to be creditors of Martin Dredging at the time of the challenged conveyance. In quitclaiming the MERMAID I to Blumenstein, Martin Dredging chose to prefer his claim over that of Phillips. To invalidate this transfer now would accomplish nothing more than the substitution of Phillips for Blumenstein as the preferred creditor of Martin Dredging. This we refuse to do.

tion, an insolvent debtor is the owner of his property and may dispose of it as he sees fit. See, e. g., Kane v. Sesac, 54 F.Supp. 853, 859 (S.D.N.Y.1943).

12. An exhaustive list of cases upholding the right of a debtor to prefer one among his creditors would require far too much space for inclusion in this opinion. The following, however, is a sampling of cases which have passed upon the validity of preferential transfers under conditions somewhat analogous to those of the present case: Bamberger, Bloom & Co. v. Schoolfield, 160 U.S. 149, 158–160, 16 S.Ct. 225, 40 L.Ed. 374; Cole v. Comm'r of Internal Revenue, 297 F.2d 174 (8th Cir. 1961); Arnold v. Hadgis, 102 Cal. App.2d 88, 226 P.2d 641 (1951); Scruggs v. Blackshear Mfg. Co., 45 Ga.App. 855, 166 S.E. 249 (1932); Jayhawk Equipment Co. v. Mentzer, 193 Kan. 505, 394 P.2d 37 (1964); Schmitz v. Stockman, 151 Kan. 891, 101 P.2d 962 (1940); Long v. Dixon, 201 Md. 321, 93 A.2d 758 (1953); Berger Furnace Co. v. Collins, 354 Mich. 289, 92 N.W.2d 338 (1958); Higgs v. Amarillo Postal Employees Credit Union, 358 S.W.2d 761 (Tex.Civ.

App.1962); Mewhinney Mercantile Co. v. Goodnight, 135 S.W.2d 230 (Tex.Civ.App. 1939); Manello v. Bornstine, 44 Wash. 2d 769, 270 P.2d 1059 (1954); Puget Sound Nat. Bank v. More, 159 Wash. 5, 291 P. 1081 (1930); Jones v. Krueger, 1 Wis.2d 27, 82 N.W.2d 910 (1957). While many of these cases are from jurisdictions governed by the provisions of the Uniform Fraudulent Conveyances Act, their holdings are applicable to the law of a common law state such as Alaska, since it is widely held that the provisions of the Uniform Act, insofar as they treat preferences given for a fair consideration, restate the common law. See, e. g., Neal v. Clark, 75 Ariz. 91, 251 P.2d 903 (1952).

13. See, for example, Pollock v. Meyer, 96 Ala. 172, 11 So. 385 (1892); Johnson v. O'Brien, 275 Minn. 28, 144 N.W.2d 720 (1966); Johnson v. Lentini, 66 N.J. Super. 398, 169 A.2d 208, 212 (1961).

14. Jayhawk Equipment Co. v. Mentzer, 193 Kan. 505, 394 P.2d 37 (1964); Toomay v. Graham, 151 S.W.2d 119 (Mo.App. 1941); Jones v. Krueger, 1 Wis.2d 27, 82 N.W.2d 910, 914 (1957).

Phillips insists, on appeal, that numerous badges of fraud shown below are sufficient to taint the challenged transaction with fraud. Yet it must be remembered that "[b]adges of fraud at most are only evidentiary facts tending to prove the ultimate fact, which is that fraud was intended." Matheson v. Patenaude, 8 Alaska 238, 243 (D.Alaska 1930). Badges of fraud must be viewed within the context of each particular case, and where their presence is satisfactorily accounted for, or where their existence is not inconsistent with a construction of the transaction as a valid one, they deserve to be accorded little weight.[15]

Elaboration of each of the elements which are contended to show the possibility of fraud in the present case is unnecessary. It will suffice for our purposes to observe that the circumstances of the present case, viewed as a whole, fail to support any realistic conclusion that Martin Dredging's conveyance of the MERMAID I was anything but a bona fide preference of Blumenstein's claim over the claims of other creditors. Nowhere it is intimated that Martin Dredging enjoyed further use or benefit from the MERMAID I after conveying it to Blumenstein, or that the company reserved any interest in the conveyance. Nor is it evident that Blumenstein, in procuring the return of the MERMAID I, was interested in anything but the satisfaction of his claim as a creditor.

The judgment of the superior court is reversed and this matter is remanded for entry of judgment in favor of the appellant.

ERWIN, J., not participating.

---

15. Thus, where the totality of the circumstances surrounding a transaction has failed to indicate fraud, or where strong showing of good faith in a transaction has been made, courts have frequently discounted the significance of badges of fraud as indicia of the character of the transaction. See, e. g., Arnold v. Hadgis, 102 Cal.App.2d 88, 226 P.2d 641 (1951); Marchbanks v. McCullough, 46 N.M. 13, 132 P.2d 426 (1942); Puget Sound Nat. Bank v. More, 159 Wash. 5, 291 P. 1081 (1930).